MISSOURI SERVICE COMPANY, a Corporation, ET AL., Appellants, v. THE CITY OF STANBERRY, a Municipal Corporation, ET AL.—108 S. W. (2d) 25.

Division One, July 30, 1937.

501

*Clarence A. Davis, Gillihan & Gillihan* and *DuBois, Miller & Beavers* for appellant.

502

*Fielding P. Stapleton* and *Robert B. Fizzell* for respondents; *Poppenhusen, Johnston, Thompson & Raymond* and *Bowersock, Fizzell & Rhodes* of counsel.

504

HAYS, J.—This suit was brought by the Missouri Service Company and eight individual plaintiffs, as taxpayers, to enjoin the performance of a contract entered into between the city of Stanberry and Fairbanks-Morse Construction Company, whereby the latter agreed to construct a plant and system for the generation and distribution of electric energy in said city, for a certain compensation agreed upon to be paid by the city. The court below granted temporary injunction. Upon the trial of the cause the court rendered decree dissolving the injunction and dismissing plaintiffs' bill. The plaintiffs have appealed.

Stanberry, situate in Gentry County, is a city of the fourth class, containing some 2000 inhabitants. On August 20, 1910, one Yenser was by that city granted a twenty-year franchise to establish a lighting system therein, which he did. Through mesne transfers the Missouri Service Company in 1927 acquired said franchise and said system, and has ever since continued to operate it nothwithstanding its charter expired in 1930.

On May 22, 1928, the voters of the city of Stanberry, pursuant to ordinance calling for and notice given of special election, voted upon the question of the issuance of $40,000 of bonds of the city "for the purpose of erecting or purchasing a municipal electric lighting system for said city." The proposal carried by popular vote of 574 for the bonded indebtedness to 105 against. Shortly thereafter the city entered into a contract with the Fulton Iron Works Company involving certain expenditures which were in excess of the amount covered by the bond issue and which excess the city was undertaking to obligate itself to pay out of the future earnings of its proposed plant. Upon injunction brought by Missouri Service and a few citizens, as here, this court upon appeal, without interfering with the issuance of the bonds, decreed that the contract between the city and the Fulton Company was invalid because violative of constitutional limitations. [See Sager et al. v. City of Stanberry et al., 336 Mo. 213, 78 S. W. (2d) 431.] That decree became final about January 1, 1935.

Thereafter, in October, 1935, the council through its engineer caused to be duly published a notice to bidders that bids would be received by the board of public works at ten o'clock A. M., November 22, 1935, at the city council chamber in Stanberry "on material, equipment and labor, comprising a complete electric power plant,

distribution system and street lighting system." The notice stated where copies of the plans and specifications might be obtained.

When the bids were opened at the appointed time by the board of public works it was disclosed that among the twenty-odd bids submitted only two of them were upon the entire project, that of the White Way Corporation of Milwaukee (hereinafter called White Way), and that of Fairbanks-Morse Construction Company (which will be called Fairbanks) ; the others were upon separate and minor portions of the project and were on that account not considered. Fairbanks' bid was $49,266; White Way's $44,900. Both of said bids being in excess of the bond issue available, these bidders were requested to reduce their bids accordingly by the elimination of certain designated items. They did so, and the revised bid of Fairbanks was accepted by the city and a contract between the city and Fairbanks accordingly was executed. The estimates upon which the bids had first been made included duplicate generating units and also series street lighting circuits, but the contract in suit, and the revised bids upon which it was let, includes the purchase of only one generating unit and purports to exclude the series street lighting circuits.

The contract was in writing, dated November 23, 1935, signed by the mayor of the city and by Fairbanks, acting through its vice president. The contractor, Fairbanks, thereby undertook and agreed, on or before March 1, 1936, to furnish all materials and perform all work or labor called for under "Sections A to C, both inclusive, of the Specifications for furnishing and installing a generator plant for the purchaser, except the following deductions: . . ." (to be noted hereinafter) and to furnish all materials and perform all work or labor called for in "Sections D to L, both inclusive, of the specifications for the furnishing and installing of a distribution system for the purchaser except the following deductions . . ." (hereinafter noted).

By other provisions the contractor agreed to execute bond in the full amount of the contract as indemnity for failure to pay for materials and labor and for faithful performance of the contract, in accordance with the plans and specifications which were attached to the contract.

In consideration of said agreements the city agreed to pay Fairbanks $41,170, of which sum $38,970 was to be paid in installments, as set forth in the specifications, and the balance $2200, was to be paid by the city delivering to Fairbanks one 15-horse power and one 25-horse power horizontal type "Y" Fairbanks-Morse oil engine.

It is contended in this court, and was in substance charged in the petition: 1. The city's performance of the contract would constitute a misapplication of the proceeds of the bond issue, because the bonds

were voted for the disbursement of their proceeds on the conditions and in the manner provided in the contract that formed the basis of the Sager suit, supra, and upon the understanding of the voters that such was the plan. 2. The contract is void because (a) unilateral, and (2) was not let to the lowest bidder. Several subsidiary questions are raised which will be ruled specifically or by implication from other rulings to be made, as may be deemed preferable.

The appellants concede that the issues involve no question of fraud in the election at which the bonds were voted, and no question of the validity of the bonds; but they insist that the project for which the bonds were voted was that $40,000 should be so supplied and that an additional sum of $56,000 was to be paid through deferred payments to be made out of the earnings of the venture; that the voters were asked to approve that plan by authorizing the bonds, and they did so. Upon the directly contrary position taken by the present appellants and others as plaintiffs in the Sager case, supra, this court ruled in favor of their then position, namely, that the incurring of such additional indebtedness of $56,000 not only was not submitted to, and authorized by, the voters of the city at any election, but also exceeded the constitutional limit of the city's permissible indebtedness. Clearly, the abstract right of the city to erect an electric light plant as described generally in the ordinance submitting the bond proposal and in the published notice of the election, as well as the issuance of the bonds in pursuance of the result of the election, was in no wise criticized, limited or affected by the Sager decision. The fair implication of that decision is that the city may use the proceeds of the bond issue ''for the purpose of erecting or purchasing a municipal lighting system for said city.''

I. The appellants complain that such is not the purpose for which the money is going to be used. The argument substantially is, that in 1927 Stanberry was without a good electrical system; also there was both need and desire for suitable means to pump the city's water supply; for a white way street lighting circuit within its business district; for a public building to house its utilities and to operate its said street lighting circuit; that later a plan, stated below, was devised whereby they might acquire all these advantages. This plan, it is claimed, was an integral part of the one that was involved in the Sager case, and is not within the purpose' for which the money is proposed *now* to be used but *was* within the contemplation of the voters when they voted for the bond issue.

The general purpose as contained in the ordinance calling the election and in the published notice thereof has been set out above. No specific plan had been adopted by ordinance as a part of the election procedure. The purpose was stated in broad, general and unrestrictive terms, except as to the amount of the bonded indebtedness to be expended for the improvement.

The evidence shows that in 1934 the city at a cost of $19,000 constructed a commodious building adequate to serve various municipal purposes, including the housing of the city-owned water pump, constructed the white way lighting circuit for the business district and installed a new Diesel engine in said building to operate the water pump and generate current for the white way circuit. All these improvements were paid for out of the current funds of the city and voluntary contributions made by citizens, leaving the proceeds of the bonds for the very purpose expressed in the proposal submitted to the electorate and thus contributing to the end in view. It is true that the improvements had been included in the estimate upon which the Fulton Iron Works Company's contract was let. But as shown above, having been made in the interim, they were not included in the revised bids or in the present contract because the building was adequate and the engine power for the proposed plant in large part already supplied and available.

It is urged that the chancellor erred in refusing to admit proffered testimony by several of the appellants, introduced as witnesses, with respect to the interpretation they placed upon the proposal submitted at the election. This testimony was that "there was no need for another, a competing plant at Stanberry; that the witnesses and the public understood the proposal to mean a light plant and distribution system sufficient to answer all the requirements of the inhabitants of Stanberry for commercial, residential and community use, need for street lighting included." There is no charge that the city authorities had any purpose to mislead the voters, or that the latter were adversely affected by the improvements made as related above. Moreover, it does not appear that the making of a plan of installing the lighting circuit was any part of the election procedure. Hence we think the proffer was properly excluded as immaterial. This proposition is settled by the following authorities: State ex rel. Kellett v. Johnson, 330 Mo. 452, 455, 50 S. W. (2d) 121; Palmer v. City of Liberal, 334 Mo. 266, 64 S. W. (2d) 265; City of Ida Grove v. Armory Co., 146 Iowa, 690, 125 N. W. 866; Humphrey v. City of Pratt, 93 Kan. 413, 144 Pac. 197.

II. As shown by the weight of the evidence the facts incident to the culmination of the contract in suit are substantially as follows:

The bids were opened by the board of public works in the presence of the board of aldermen and the city engineer. The reduction in the "unit" bids of Fairbanks and White Way, whereby the bids might be brought within the specified sum of $40,000, was invited by the city to be made by the two bidders upon the basis of the printed plans and specifications being modified in accordance with certain tabulations then and there made by the city engineer at the instance of the proper city officials. The tabulation sheets show in detail

exactly what eliminations were to be made in the contract which might be awarded to the successful bidder, each elimination being specifically identified with certain work and labor. So that, by subtracting from the base bid such eliminations as were disclosed by the tabulation sheets, the identity of all the work and material was apparent to all persons concerned, and was covered by the contract subsequently executed. The representatives of Fairbanks and White Way, then present, were fully aware of the proposed modification and singly, from time to time, through the day discussed the same in detail and negotiated with the board of public works. Finally, the board of public works recommended to the board of aldermen the acceptance of Fairbanks' bid, and said latter board, in executive session, by duly enacted ordinance accepted said bid and directed that a contract accordingly be entered into by the city and signed by the mayor. The same was so executed by the mayor and by Fairbanks on the following day, November 23, 1935.

The basis of the bids and of the contract was one and the same. The prices of both Fairbanks and White Way, respectively, were secured on each elimination; their representatives were treated alike—fairly, considerately and in good faith by the city's representatives throughout the dealings—to the satisfaction of the representatives of the companies, and they so testified.

It seems that the determining factor in the choice as made between the two bids was the type of Diesel engine in the size proposed. White Way was not a manufacturer of Diesel engines and in its bid it proposed to furnish a "Norberg" product, for less than the bid of Fairbanks covering an engine of the latter's manufacture. The Norberg Company had been making a Diesel of that size during a very limited time and its only one of that size and type in actual operation was located and had been in operation (at a point in Iowa) less than two years. Engines of the Fairbanks-Morse type, as the members of the city boards were well aware, were in actual and satisfactory operation in several cities in the vicinity of Stanberry, and one such engine, as stated herein above, lately had been installed in Stanberry; servicing and parts, as necessary, were readily and promptly procurable from Kansas City. The board of public works unanimously chose and recommended the purchase of Fairbanks-Morse's engine. The board of aldermen unanimously accepted the recommendation and accordingly accepted that company's bid and awarded the contract in the manner stated above.

As against the specific charge that in so doing the city officers acted arbitrarily, we find that the award was made by them honestly and in good faith in the exercise of their considered judgment as to what was for the best interests of the city. Illustrative of this is the testimony of one of them: "We discussed the two proposals and

510

compared them and discussed them and one thing and another like that and we weighed them and just like you were going to purchase two different articles, and we thought we would try to choose the best contract for the money." The testimony of the others was similar. The evidence shows there was no deception, collusion, favoritism, or misunderstanding about the matter.

The charge that the contract in question was the result of the delegation of the legislative power of the city officials, in the premises, to the city engineer, finds no substantial support in the evidence. The engineer served the city in a technical, advisory and purely ministerial capacity as was proper. Such matters as were committed to him were mere ministerial details. More than that, the authorization by the board of aldermen of the contract and the execution thereof by the mayor were of an administrative, not legislative character, and hence not within the legislative function.

It therefore appears that if the contract should be performed by the contractor, the city will possess a "municipal electric light system," consisting of both generating plant and distribution system; not one or the other alone, as were the situations before the courts in the authorities cited by the appellants, wherein upon a similar proposition the contracting municipality, after the contractor's performance, would have but one or the other part of the proposed system; 44 C. J. 1209; Kansas Electric Power Co. v. City of Eureka, 45 Pac. (2d) 877; Beers v. City of Waterton (S. D.) 177 N. W. l. c. 505. Moreover, the appellants assert in their brief that "this matter, of course, is controlled . . . by Article 10, Section 20 of our Constitution." This constitutional provision, if controlling where seasonably invoked, really is not available to the appellants since they for the first time raised it in their brief; too late, under our numerous previous holdings. Yet, notwithstanding, the merits of the supposed constitutional question were virtually decided in the fore part of this opinion.

III. That the contract was executed pursuant to ordinance is beyond question. It seems equally plain that it does not offend against the general statute (now Sec. 2962, R. S. 1929). It has no such infirmity as was pointed out in the contract held in judgment in the leading case of Anderson v. Ripley County, 181 Mo. 46, 80 S. W. 263, cited by appellants. Therein the county's contract was held to be violative of the statutory requirement that the contract, including the consideration, should have been in writing, whereas in fact, subsequent to its execution, it had been so amended as to include subsequent alterations in the original plan, thus *adding* greatly *to the cost* agreed upon, contrary to the spirit of the statute which was enacted for the protection of the public (our italics).

If, as contended by appellants, the contract was unilateral, it is void. [Hudson v. Browning, 264 Mo. 58, 174 S. W. 292.] But as we view it the promises contained in it were mutual throughout.

So contending the appellants argue that it is impossible to determine whether the city is to receive any poles or not, and that at most 125 poles would be what the city could receive. Section D of the specifications relates to poles, and they are divided into two classes: Series street lighting circuit for which 375 poles are enumerated, and primary circuit for which 125 poles are enumerated, and lump sum bids on each of such circuits were required. It was indicated that the purchaser intends to purchase the poles for the first mentioned circuit, but if the purchaser intends to purchase both classes they will be included in the contract for the one class. It is further substantially provided that at the time the major shipment moves forward the contractor will add to or deduct from the whole at the price units set out in the specifications.

The contract by No. 1 of the deductions eliminates the series street lighting circuit. Appellants insist that this elimination made by the contract necessarily applies to the 375 poles which had been planned for the series street lighting circuit. The respondents' evidence shows that it applies only to the wire, brackets and lamps for the brackets and the labor of installing all such for the series street lighting circuit, the elimination totaling in cost price $2,117, and that not a pole was eliminated. We think the respondents have the better of the argument. The poles that would have carried the series street lighting circuit were intended also to carry other wires, as it was shown in the evidence. Also, the 125 poles, admittedly, were wholly insufficient in number to answer after the elimination of the series street lighting circuit. The appellants objected to any oral evidence on this subject, but the trial court overruled the objections—properly so, we think—on the ground that the language of the elimination was ambiguous. [State ex rel. Morrison Investment Co. v. Trimble, 301 Mo. 146, 1. c. 152-3, 256 S. W. 171; Laclede Const. Co. v. Moss Tie Co., 185 Mo. 25, 84 S. W. 76.]

Again, the undisputed evidence showed that prior to the institution of the present suit and before any litigation or controversy arose, respondent Fairbanks had already shipped to the city of Stanberry over 300 poles. Under all the testimony approximately 500 poles are required to construct a complete lighting system for Stanberry. Furthermore, the detailed tabulations of bids, referred to above, sustains the oral evidence above. It is an axiom of interpretation that "the construction which the parties themselves place upon language is the criterion of its meaning." In interpreting a written municipal contract, with the aid of extraneous evidence and as interpreted by the parties, this court in the leading case of St.

Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, said, *inter alia* (l. c. 128):

"If the court gives one (interpretation) different from that understood by the parties, it in effect makes a new agreement—the very thing most to be avoided. If it leaves the parties to be governed by their understanding of their own knowledge, it in effect enforces the contract as actually made. That they should be so permitted to construe their own agreement, accords with every principle of reason and justice."

A like contention is made with respect to transformers, meters and wire. The contract covers transformers having a total capacity of 129 K. V. A., divided into specific groups of transformers of varying capacity as fully set forth in the specifications. The same is true as to meters and as to wire. The specifications cover 300 meters of a character described in the specifications and 7500 feet of No. 8 wire, 18,000 feet of No. 6 wire, and 100,000 feet of No. 10 wire. By the contract 100 of such meters and the wire necessary to install the same were eliminated, and also 20,000 feet of said No. 10 wire (for house drops) was eliminated. The contract covers definite quantities of the materials, together with the cost of installing the same. The unit prices also mentioned by the contractor in its bid on certain of the separate sections were merely for the purpose of specifying a price at which the city might purchase additional equipment, such as transformers, meters, etc., if the city should desire to purchase additional units at the specified prices, or to permit the elimination of a specified number of units at the specified unit prices if the city should desire to eliminate any of such units. The total amounts of the materials covered by the lump sum bid are definitely stated in the specifications and the contractor must furnish and install the exact quantity of materials described in said specifications. The tabulation sheets show in detail exactly what eliminations were made by the contract, each elimination being specifically identified with certain work and labor. By subtracting such eliminations from the base bid as disclosed by the tabulation sheets, the identity of all the work and material covered by the present contract is definitely established. Fairbanks has contracted to furnish all materials and perform all work or labor called for under the contract except the eliminations and deductions expressly mentioned in the contract.

The eliminations, apart from the reductions reviewed above, were fully explained in the evidence and had to do with the generating system. It is needless to go into the details. Many of such eliminations duplicated various units with which the city was already supplied, namely, the white way, new Diesel engine, and the equipment available in the aforesaid recently constructed public building. The remaining eliminations, according to the weight of the evidence,

affected various supplementary aids or refinements, desirable but not necessary to the efficient operation of the light plant, and none of those eliminated will reduce or affect the plant's efficiency.

IV.   The poles as contracted for were cedar.   On the next morning after the execution of the contract the city, by its engineer, advised the representatives of Fairbanks that the city would prefer poles of pine, which were of considerably lower price.   The representative agreed to the substitution, which reduced the cost price around $100.   Some two weeks later Fairbanks by letter confirmed the substitution.   The appellants regard the change, which was followed by the delivery mentioned above, as an unauthorized change in the contract.   The implications of the ruling earlier made herein upon the statute there cited are sufficient, we think, to indicate that this point raised by the appellants has no merit.   [See, also, Stover v. City of Springfield, 167 Mo. App. 328, 152 S. W. 122.]

V.   Question is raised as to the propriety of the city's transferring two used engines to the contractor in part payment of the city's obligation.   Neither bad faith nor poor judgment in that regard has been shown.   There was oral evidence before the trial court that the exchange was a fair one.   The engines, though serviceable, would not serve the city's proposed enterprise.   The exchange to that extent is plainly advantageous in that it diminishes the city's necessary total pecuniary outlay.   In New York a clause in a paving contract authorizing the contractor to appropriate the old material was sustained to the extent it diminished the cost to the city.   [Berg v. Grace, 1 N. Y. St. Rep. 418, l. c. 421, 40 Hun, 639.]

VI.   The chief complaint of the appellants is that the lighting system covered by the contract is inadequate to serve the needs of the city.   Perhaps the greater part of the extremely voluminous printed record is devoted to this issue, upon which there was a sharp conflict in the testimony.   We have carefully read the record but shall not here undertake again to go into its details.   Specifically and principally, appellants insist that the generating plant is not large enough;   the capacity of the transformers contracted for is not sufficient;   the number of meters inadequate;   and a secondary distribution system is not included.

As, like the court below, we think the greater weight of the evidence lies with the respondents, we note only testimony given in their behalf by expert lighting engineers, or owners or operators of electric lighting systems in cities similar in size to Stanberry: As to the generating system the testimony was to the effect that the engine contracted for with 100 K. W. K. capacity, would alone be sufficient,

without overload, to take care of the normal peak load in the city, and that the combined capacity of said engine and the Diesel engine already owned by the city (total capacity 147 K. W. K.) would without overload, be more than the peak demand (144 K. W. K.) ever experienced in Stanberry by appellant Missouri Service. With respect to the sufficiency of the system covered by the contract, such engineers testified that it would give reasonable and adequate service, and that the materials were of standard quality the same as in similar service in the respective cities they referred to—Gallatin, Bethany and Cameron. Secondary systems were described, and such a system was shown by the contract, in issue, and the two drawings which formed a part of the contract, to be a part of the system.

Those drawings, accepted alike by the bidder and the city, show the primary circuits by lines, and the secondary circuits by characters representing the transformers and their placement as indicating where the primary current was to be so transformed as to enable the conduction of 110 V current over a smaller or secondary service wire and also to permit, as occasion might require, the transmission of a primary current of 220 V thence over a larger wire—now become primary and remaining primary until, perchance, arrested in like manner by a transformer, and so on and on according as service requirements might develop. Such transformations were also depicted by red lines appearing upon a drawing (respondents' Ex. 10) like the contractual drawings referred to above, except for said red lines made by respondents' engineer, Mr. Lowry, whose testimony clearly explained the adequacy and efficiency of the secondary circuits. Lowry's said plat was made after the execution of the contract and was unrestrictedly admitted in evidence over objection made and based substantially on the ground it was not admissible as primary evidence. We think the objection was well taken. However, this plat was limitedly admissible; that is to say, admissible for the limited purpose of illustrating Lowry's oral evidence and that of other witnesses, and therefore it is restricted to that purpose in our consideration of the case.

The appellants operate in Stanberry a distribution system only, and derive the electric current from Maryville through high-tension wires carrying a voltage of 23000. In support of their contention regarding the sufficiency of respondents' system the appellants place much reliance upon the comparison they make between the two systems. The record before us shows plainly enough that ever since, if not before, Missouri Service's acquisition of its distribution system at Stanberry the citizens, almost of one mind, have favored a municipally owned lighting system and have continually sought to attain that end. Not until mid-summer of 1935—after the city had constructed and partly equipped its public building to house, and had

acquired part of the necessary engine power for a generating system —did Missouri Service partially renovate its said system and bring it to its present condition and extent. Such renovation, undertaken against the written and express protest of the city council, with the result upon which comparison was made, does not, in our estimation, militate against the adequacy and efficiency of respondents' contractual system for electric lighting, with the existing adjuncts referred to, as constituting an adequate and efficient system as distinguished from a *complete* system.

In fact, as shown by the evidence, Missouri Service's system was not complete. Nor is completeness essential. Respondent city's plant as covered by the contract is as near complete as it reasonably could be constructed with the bond fund available for that purpose. There is both reason and respectable authority for the assertion that in such a case, even though a much larger sum may eventually be needed to complete said system, the letting of a contract for a part of the system is not an abuse of power. [Yaryan v. Toledo, 8 Ohio Cir. Ct. Rep. (N. S.) 1, Id., 75 Ohio St. 584, 81 N. E. 1199.] Again, such power, absent abuse thereof, was inherent in the city. As said in 1 McQuillin on Municipal Corporations (2 Ed.), section 390, page 937: ''If the result of a given action, as the letting of a contract for an improvement, the construction and operation of a particular utility, or the enactment of a certain ordinance is an economic mistake, a municipal extravagance, and an improper burden upon the taxpayer, as so often is urged in contests of this nature, the prevailing answer of the courts is that the remedy, if any exists, is at the ballot box, rather than by injunction or other court proceeding.''

VII. Finally, it is urged that the contract is void because it was not let to the ''lowest and best'' bidder. The published notice to bidders as reflected in the record does not contain the phrase just quoted. However, the contract was let on competitive bids.

The expression ''lowest bidder'' is used in its logical and practical, rather than in its grammatical sense. [Hagar v. Melton, 66 W. Va. 62, 66 S. E. 13, 17.] ''The general rule as deduced from the cases is that, in awarding contracts of this nature, public authorities are invested with discretion in determining who is the lowest and best bidder, and their discretion will not be interfered with by the courts, even if erroneous, provided it is based on a sound and reasonable discretion founded on facts and exercised in good faith, in the interest of the public, without collusion or fraud, nor corruptly, nor from motives of personal favoritism or ill will, and not abused.'' [State ex rel. v. Dreyer, 183 Mo. App. 463, 486, 167 S. W. 1123, quoting footnote of 38 L. R. A. (N. S.) 655. See, also, 44 C. J., p. 111, sec.

2207.] The case of Gast v. Longston (Mo. App.), 15 S. W. 353, is pertinent to this question and also under another holding therein, l. c. 355, (1, 2) and 356, the present contract may correctly be ruled to have been properly negotiated after the rejection of the original bids.

The judgment is affirmed, and the cause is remanded with directions to the circuit court to hear motion for assessment of and to assess damages on the injunction bond heretofore filed in this court.

All concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.