Aquamsi Land Company, a Corporation, Appellant, v. City of Cape Girardeau, a Muncipal Corporation and City of the Third Class, Charles G. Wilson, Mayor, Harry L. Coffman, L. H. Butler and Philip Steck, Commissioners and Councilmen.—142 S. W. (2d) 332.

Division Two, July 3, 1940.

*Giboney Houck* and *Brandom Hope* for appellant.

*R. P. Smith* and *B. Hugh Smith* for respondent.

ELLISON, P. J.—The appellant corporation, a freeholder and taxpayer in Cape Girardeau, a city of the third class operating under the commission form of government, brought this suit in March, 1937, to enjoin the city, its mayor and commissioners from expending the proceeds of a $55,000 bond issue voted by its citizens in January, 1937, in the construction of a recreational and community center, and for other purposes incident thereto. No temporary injunction was prayed. The project was to be constructed with the aid of an appropriation of $164,853 from the Federal Works Progress Administration. After a trial the circuit court denied the injunction and dismissed appellant's bill. It appealed to the St. Louis Court of Appeals giving a $200 appeal bond. That court transferred the appeal to this court under Sec. 12, Art. VI, Sec. 3, Amendment of 1884, Constitution of Missouri, and Sec. 1914, R. S. 1929, Mo. Stat. Ann., p. 2587, on the theory that the monetary amount in dispute exceeds $7500.

We accept jurisdiction. This case involves more than the mere question of *how* the city's $55,000 bond issue shall be spent, and therefore such cases as St. Louis Union Trust Co. v. Toberman, 345 Mo. 613, 134 S. W. (2d) 45, are not in point. A decision adverse to the respondents would entail the loss of the Federal grant—if jurisdiction theoretically is to be fixed by the status of things when the appeal was taken in June, 1937, as has often been held. [DeHatre v. Ruenpohl, 341 Mo. 749, 754, 108 S. W. (2d) 357, 360.]

On June 13, 1936, the City Council of Cape Girardeau sponsored an application to the Federal Works Progress Administration for an allotment of $164,853, the city to contribute an additional $32,572.50, for the construction of a project described as a "recreational and community center and fair ground" on a tract of approximately 50 acres within one mile of Cape Girardeau, which was to be provided by the city. On November 18, 1936, the W. P. A. (as we shall hereafter call it) office advised the city that the project had received

Presidential approval. This executive order described it as a "recreational and community center and fair ground" calling for the erection of a "community building and stadium with indoor court for games and community activities;" also for landscaping and grading the grounds, building a race track, athletic field, drives, entrances, etc.

On December 2, 1936, the City Council adopted an ordinance providing for a special election on January 5, 1937, to vote on a municipal bond issue of $55,000 "for the purpose of acquiring property and establishing and improving the same as a *public park.*" (Italics ours.) The notice of election also contained the quoted language describing the project as a public park. The proposition carried at the election. The intention of the W. P. A. and the city was to build the recreational center mentioned above in this public park. The city proposed to use about $17,000 of the proceeds of the bond issue in buying the land, and the rest of it in construction work, along with the Federal allotment. Appellant's first contention is that the contemplated "recreational and community center and fair ground" does not properly come within the designation "public park," and therefore the proceeds of the municipal bond issue voted for the latter purpose cannot be used for the construction of the project.

The architects' revised preliminary study or map and other evidence were introduced, showing the project would ultimately include a fair ground, community building, stadium, race track, grandstand, baseball and football fields, an arena with a floor area of 86 feet by 126 feet, a plaza and bandstand for outdoor meetings, stables and space for exhibits and concessions, areas for the parking of automobiles and the like. One witness for appellant testified that from scaling the map it appeared about 90% of the whole site would be used for these purposes and only 10% left open for ornamentation and the unrestricted use of the public. This witness testified he had traveled extensively in the United States, and had never seen a public park where 50% of the area was occupied by buildings and structures of various kinds. The architect for respondents said the maximum restricted area in the park would be approximately 25%; and that less than 2% of the 50 acres would be covered by buildings. An examination of the map shows this is more nearly true. Appellant's witness evidently was including the space within the one-half mile race track and all the ground that would at any time be devoted to special uses.

Appellant's brief substantially quotes the following definition of a park from Williams v. Gallatin, 229 N. Y. 248, 253, 128 N.E. 121, 122, 18 A. L. R. 1238, 1241: "A park is a pleasure ground set apart for recreation of the public, to promote its health and enjoyment." But the brief makes no reference to what follows immediately thereafter: "It need not, and should not be a mere field or open space,

but no objects, however worthy, . . . which have no connection with park purposes, should be permitted to encroach upon it without legislative authority . . ." (Italics ours.) Enumerating structures which do have a natural connection with park purposes, and therefore require no special legislative sanction, the opinion says: "Monuments and buildings of architectural pretension which attract the eye and divert the mind of the visitor; floral and horticultural displays, zoological gardens, playing grounds, and even restaurants and rest houses, and many other common incidents of a pleasure ground, contribute to the use and enjoyment of the park. The end of all such embellishments and conveniences is substantially the same public good. They facilitate free public means of pleasure, recreation and amusement and thus provide for the welfare of the community. The environment must be suitable and sightly or the pleasure is abated. . . ."

Numerous judicial definitions of the word park are given in Words and Phrases (all series). Exhaustive annotations on the question as to what use may be made of public parks appear in 18 A. L. R., p. 1246 and 63 A. L. R., p. 484. Where the land has been dedicated to public use as a park by private grant with conditions annexed, the conditions must be complied with; but where purchased or condemned by the municipality greater liberality of construction is allowed. The land for the project site in this case was purchased under authority of Sec. 6829, R. S. 1929, Mo. Stat. Ann., p. 5633, which permits the acquisition of property "for public parks and squares," within one mile of the city. Since the purpose of a park is to contribute to the recreational welfare of a city, the uses to which it may be put will depend somewhat on the local environment. In a congested population center where the whole space is required for the outdoor congregation and relaxation of citizens, or as a playground for children, an encroachment on these uses might be unwarranted when it would be permissible in other circumstances. We take judicial notice that Cape Girardeau is a city of 16,227 population, and that the Southeast Missouri State Teachers College is located there. We may therefore properly infer, if indeed we cannot take judicial notice of the fact, that it is a cultural and athletic metropolis in that part of the State.

There is no doubt in our minds about the fact that the contemplated athletic facilities come within proper park usage. It was ruled in Miller v. City of Columbia, 138 S. C. 343, 351, 126 S. W. 484, that an athletic stadium could not be built in a certain public park in that city, but that was because such use would violate restrictive covenants contained in the private grant by which the park was dedicated. In the instant case the large arena building, with a floor area of 86 feet by 126 feet, and a stage 20 feet by 60 feet, is adapted to public speaking of an educational, religious or political nature,

theatrical and musical entertainments, dances and indoor athletics. Another hall in the building will accommodate smaller gatherings, banquets and exhibits of various kinds. We see no objection to that. The erection of a large auditorium in a small park was condemned in Anderson v. Thomas, 116 La. 512, 117 So. 573, where the building would subvert the intended basic uses of the park. But the erection of similar edifices was approved in Slavich v. Hamilton, 201 Cal. 299, 257 Pac. 60; Futterer v. Sacramento, 196 Cal. 248, 237 Pac. 48.

Whether a municipal park may be used as a fairground for horse racing is a more difficult question. It was held in Golf View Realty Co. v. City of Sioux City, 222 Iowa, 433, 269 N. W. 451, that the statutory power to acquire land for parks embraces the power to purchase it for a golf course. In that case the tract was already under lease to the city and in actual use as a municipal golf course. It is a matter of common knowledge that golf courses require a large area and are subjected to restrictive use. Also City of Wichita v. Clapp, 125 Kan. 100, 263 Pac. 121, 63 A. L. R. 478, ruled the devotion of a reasonable portion of a public park to an aviation field for recreation and other attendant purposes, came within the legitimate and proper use for which public parks are created. The reasoning of these cases, which makes the outdoor recreative nature of the proposed use the determinative factor, would apply to a track and facilities for horse racing. Hialeah Park, Tropical Park, Belmont Park, Arlington Park, Jefferson Park and Woodbine Park, for example, are famous race courses. We do not say or know that these are municipally owned, but merely point out that the word park has been thus widely associated with the sport of horse racing.

Appellant cites City of Nebraska v. Nebraska Speed & Fair Assn., 107 Neb. 576, 586, 186 N. W. 374. In that case the city had leased 30 acres of a 46 acre public park to a Fair Association for a term of 25 years, for racing purposes, the lessee to have exclusive use of the leased premises. The Nebraska Supreme Court held a city cannot by lease, estoppel or otherwise, grant to any person or association the use and control of such part of its public park as practically to deprive the public of its enjoyment continuously, nor delegate the use and control thereof to private individuals or associations. But the opinion conceded the city could grant the Association a license or concession to hold race meets in the park for limited periods of time and permit it to control the race track during and preparatory to those meets. The facts are clearly distinguishable from those in the instant case, and the decisions in part supports respondents' theory.

The next group of assignments contends the following three alleged contracts or agreements made by the city with the W. P. A. unlawfully attempted to delegate the city's governmental and legislative power. (1) The application for the W. P. A. allotment, signed by L. H. Butler, one of the three city commissioners of Cape Girardeau,

contained this recital: "It is understood . . . that all operations will be in accordance with regulations prescribed under the Emergency Relief Act of 1935 and administrative orders and instructions issued by the Works Progress Administration." (2) The City Council of Cape Girardeau on a date not shown by the record adopted a resolution reciting that if the State W. P. A. would obtain Federal approval of its application for the project, the city would each year, "at its own cost and expense, maintain the project in a manner satisfactory to the said Works Progress Administration or its authorized representatives." (3) On another date not shown the names of the city, the mayor, treasurer and a member of the Council were signed to a unilateral agreement, which acknowledged the W. P. A. and the U. S. Government were not obligated to prosecute and operate any part of the project beyond June 30, 1937; and that the city would complete all work unfinished after that date on parts of the project which otherwise would be left in an unsightly condition to the discredit of the W. P. A.

Before taking up the question whether the alleged contracts were legal, we should interpolate that respondents say in their brief and present a photographic exhibit showing much work has been done on the project pending this appeal. They argue we ought to take that fact into consideration and refuse · to interfere by injunction since the work has progressed so far. Appellant asserts we cannot go outside the bill of exceptions and cognize events since the appeal. We agree with appellant on that point. But we also hold that even if such work has been done, and regardless of whether the chancellor's decree erred in finding the three contracts mentioned in the last paragraph were not invalid, still any judgment or decree rendered by us here must speak only from the date of its rendition and cannot relate back to the date of the decree below—this for the reason that appellant did not seek or obtain in the trial court an order suspending its decree pending the appeal. The mere giving of an appeal bond did not have that effect, but only operated to stay execution for costs. [3 C. J., sec. 1405, p. 1280, sec. 1456, p. 1325; 4 C. J., sec. 632f, p. 1116, sec. 672, p. 1154; 3 Am. Jur., sec. 558, p. 205; C. H. Albers Comm. Co. v. Spencer, 236 Mo. 608, 628, 139 S. W. 321, 325, Ann. Cas. 1912D, 705.]

Nevertheless, this does not relieve us from deciding whether the alleged contracts were valid or void. We have no hesitation in holding all three contracts were and are void as they stand, under Sec. 2962, R. S. 1929, Mo. Stat. Ann., p. 1827, which provides:

"No . . . city, . . . or other municipal corporation shall make any contract, unless the same shall be within the scope of its power or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including

534

consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing.''

Any attempted contract with the city of Cape Girardeau which failed to comply with the requirements of this section was unenforceable. [West Va. Coal Co. v. City of St. Louis, 324 Mo. 968, 977-8, 25 S. W. (2d) 466, 469.] The W. P. A. in contracting with the city was not acting in the superior capacity of a soverign but stood in the same position as a private party. [Arkansas-Missouri Power Co. v. City of Kennett (8 C. C. A.), 78 Fed. (2d) 911, 922.] None of the three alleged agreements complied with the statute. The first one was embodied in a mere application for the W. P. A. allotment, signed only by L. H. Butler, one of the city's three commissioners. The second was a resolution adopted by the City Council and does not even purport to be an executed written contract. The third was an undated unilateral agreement to which only the signatures of the city, the mayor, the treasurer and one member of the City Council were suffixed. It was not signed by the W. P. A.

Reverting to appellant's challenge of the substantive validity of the three alleged contracts on the ground that the city attempted therein to delegate to W. P. A. its governmental and legislative power. We shall consider these·questions briefly because they may arise hereafter. The rule is well established, subject to certain exceptions, that such powers cannot be delegated by a municipality, and this is true whether the effort be to transmit them to subordinates, or to barter them away by contract. [43 C. J., sec. 213, p. 211, sec. 237, p. 239; 44 C. J., sec. 2129, p. 73.]

In School District No. 37, Clark County, Wash. v. Isackson (9 C. C. A.), 92 Fed. (2d) 768, a school district entered into an agreement with the P. W. A. similar to the one involved here, in consideration of a grant of public funds to build a schoolhouse. It was held that a provision in the grant agreement requiring the contractor's bid to be satisfactory to the P. W. A. state engineer, did not surrender any of the school district's discretionary power but simply necessitated the approval of an additional agency. The grant agreement further required the plans, specifications and construction contracts to be in form and substance as approved by the United States. With reference to that stipulation the decision ruled that the school district had the choice, in its discretion, or refusing or accepting the grant and requiring the contractor to comply with the conditions enumerated therein; and that in accepting the grant it exercised its discretion and decided the contractor must comply with the lawful conditions thereof.

We are unable to follow the reasoning of this case. It is directly contrary to that adopted in Arkansas-Missouri Power Co. v. Kennett, Mo., supra, 78 Fed. (2d) 911, where the City of Kennett obtained

money for the construction of a municipal utility through the sale of its bonds to P. W. A. The loan agreement with the latter provided among many other things, that "all construction contracts made by the borrower and all subcontracts for work on the Project shall be subject to the rules and regulations adopted by the Government. . . ." Speaking of these requirements the U. S. Court of Appeals for this circuit said (78 Fed. (2d) 1. c. 922):

"Into the actual construction of such a plant, two things enter—labor and material. The selection of the labor and material to be used in erecting the plant requires the use of judgment. The duty to exercise that judgment is imposed upon the council of the city. We think that it may not contract that duty away or share it with others. That does not mean that it may not have plans and specifications prepared by architects and engineers, or that, when such plans have been finally approved by it, it may not let a general contract for the doing of the work and the furnishing of the materials. It does mean that in selling its bonds or otherwise financing the project, it may not delegate to the person who furnishes the money and substantial discretion with respect to the selection of labor or material to be furnished, or share with that person the authority to direct and control the construction. . . ."

On authority of the decision just cited, we hold void the first attempted contract between the City of Cape Girardeau and the W. P. A. whereby the former undertook to pledge itself sight unseen that "all operations will be in accordance with regulations prescribed under the Emergency Relief Act of 1935 and administrative orders and instructions issued by the Works Progress Administration." We do not mean to say the city lacks authority in the exercise of its discretion to make a contract for the construction of the park, recreational center and fair grounds which will be satisfactory to W. P. A.; but only that it cannot delegate that authority and discretion except as to minutia—such matters as would ordinarily be entrusted to an architect or other expert. We further hold invalid the second alleged contract, namely, the purported undertaking in the resolution adopted by the city council, that the city would each year at its own cost and expense maintain the project in a manner satisfactory to the W. P. A. Under Sec. 6829, R. S. 1929, Mo. Stat. Ann., p. 5633, supra, such an agreement might entail the levy of an annual tax. Our conclusion is the same on the third alleged contract binding the city to complete all work unfinished after June 30, 1937, on parts of the project which would otherwise be left in an unsightly condition. This might involve the expenditure of more money than the whole bond issue.

The next question is whether the attempted agreements just held invalid were inseparable parts of the whole scheme for the project, and whether the appellant is entitled to an injunction henceforth

restraining respondents from constructing any of it. We think these questions should be answered in the negative so far as appellant is concerned. It can complain only insofar as the enterprise violates its rights. The status of affairs between the city and W. P. A. is a different thing. As matters stand the city has issued $55,000 in bonds, bought 50 acres of land and started to build a park, recreational center and fair grounds on it. The W. P. A. has contributed money. What further steps may be taken rests in the determination of the two contracting parties—subject of course to the requirements of the law.

 Appellant further assails a written contract made by the city with Messrs. Lynch and Jourdan, architects, on January 26, 1937, in anticipation of and contingent upon Federal approval of the project and a Federal grant. The part of the contract especially assailed provided; "The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, and detail drawings; all engineering and special technical services; the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keeping of accounts, the general administration of the business and supervision of the work."

The contention made is that this also constituted an unlawful delegation of governmental powers. The form and execution of the contract are not questioned. We think appellant's counsel are mistaken. The quoted language does not even purport to oust the discretion of the City Council and to confer on the architects exclusive authority to design the project and supervise its construction. On the contrary, it is plain the architects were to serve the city "in a technical, advisory and purely ministerial capacity as was proper. Such matters as were committed to (them) were mere ministerial details." [Mo. Service Co. v. City of Stanberry, 341 Mo. 500, 510, 108 S. W. (2d) 25, 29(3).] See also the quoted excerpt supra from Arkansas-Missouri Power Co. v. City of Kennett, Mo.

 Appellant also attacks the contract because no authorization of it was entered upon the records of the City Council until a resolution was adopted nearly three months after its execution. The decisions cited by appellant on this point are so far afield that we shall not cite them. It was held in Haskins v. City of DeSoto (Mo. App.), 35 S. W. (2d) 964, 967(3) that the contract of a consulting engineer with a city of the third class to plan and supervise the construction of a sewer need not be authorized either by resolution or by ordinance.

 Finally appellant complains of the exclusion of the depositions of five witnesses which were taken by appellant, four of them being respondents. The witnesses were all present in the county and within 40 miles of the place of trial at the time of trial. The Chancellor excluded the depositions for the reason under Sec. 1780, R. S. 1929, Mo. Stat. Ann., p. 4037. Appellant cites Sec. 1516,

R. S. 1929, Mo. Stat. Ann., p. 1671 which provides that "depositions, taken to support or dissolve an injunction, may be read on the final trial or other proceedings in such cause." This section has nothing to do with the question under discussion, but in any event does not mean the depositions may be used otherwise than as they would be in an ordinary civil case.

Appellant further relies on Dawes v. Williams, 328 Mo. 680, 40 S. W. (2d) 644, 646(2) which says it has long been the rule that the deposition of a defendant taken in the cause may be read in evidence by the plaintiff, if revelant as an admission of defendant, though he is present and willing to testify. In presenting the deposition in this case counsel for appellant did not inform the court he was seeking to introduce them, or parts of them, as admission against interest, but simply offered them in their entirety. In one instance he did not even tell the court the deposition had been given by a defendant. In another the witness was not a defendant. An examination of the depositions shows that parts of them were directed to formal matters and things about which there was no controversy. Those parts would have been open to objection if they had been offered as admissions. We think there was no error in excluding them. Furthermore, the depositions are preserved in the record, and, this being an equity case, we can consider them even though they were excluded below. [Jones v. Thomas, 218 Mo. 508, 544, 117 S. W. 1177, 1188; Cunningham v. Kinnerk, 230 Mo. App. 749, 767, 74 S. W. (2d) 1107, 1115 (15).] Treating them as evidence, we find nothing in them to change the result.

The question remaining is what orders we should make in disposing of the case. As already stated, no temporary injunction was sought by appellant in the circuit court, and the chancellor denied a permanent injunction. Appellant did not ask nor obtain an order suspending that decree pending this appeal, and our judgment can speak only from the date of its effective rendition. We have held the use of the park for a "recreational and community center and fair ground" will not be illegal; and that the use of the funds derived from the bond issue for that purpose would not constitute a diversion of them. That far we have ruled against appellant.

But we have also ruled against respondents by holding the three alleged contracts between the City and the W. P. A. for the construction, maintenance and completion of the project were void. Does that call for a judgment reversing the decree of the trial court and substituting a decree enjoining the respondents from performing those three illegal contracts? We think not, when it is considered that our judgment speaks only from the present. The whole theory of respondents' defense has been that the three contracts and performance thereunder were legal. In other words they have sought to show they are within the law, not to justify its violation. There is

no ground for assuming or anticipating they will continue performance of the contracts now that we have hḙld them void. They can make new contracts which will be valid if they are executed as the statute requires and do not unduly delegate the City's administrative and legislative power. We therefore think the decree below denying a permanent injunction should be merely affirmed. But inasmuch as this is an equity case in which the costs may be apportioned, and appellant has obtained substantial relief by this appeal, the costs should be taxed one-half against each party. It is so ordered.

Decree affirmed. Costs taxed one-half against each party. All concur.