ARKANSAS-MISSOURI POWER CORPORATION, a Corporation, et al., Plaintiffs-Appellants, v. CITY OF KENNETT ET AL., Defendants-Respondents.—156 S. W. (2d) 913.

Court en Banc, September 25, 1941.

Rehearing Denied, December 16, 1941.

*Hal H. McHaney, Henry C. Walker, Langdon R. Jones* and *Patterson, Chastain & Smith* for appellants.

*Arthur U. Goodman, Jr., Elbert L. Ford* and *Robert B. Fizzell* for respondents; *Poppenhusen, Johnston, Thompson & Raymond* and *Bowersock, Fizzell & Rhodes* of counsel.

1112

HAYS, J.—This is a suit in equity by the Arkansas-Missouri Power Corporation and certain other taxpayers in the City of Kennett, Missouri, brought against said city, certain of its officers and others. The bill prays for an injunction to prevent the carrying out of certain contracts for the erection of a municipally-owned electric power plant and distribution system. The project is financed in part at least through a loan and grant from the Federal Emergency Administration of Public Works, hereinafter called the PWA.

In 1933 the power company was supplying customers in the City of Kennett with electrical energy. The company did not have a franchise at that time and its present suit is based solely upon its status as a taxpayer of the city.

On August 9, 1933, there was submitted to the voters of the city a proposition for ▮▮▮ the issuance of municipal bonds in the amount of $140,000 to erect a power plant and distribution system. The proposition carried by the requisite majority. Early in the next year the city applied for a PWA loan and grant and on April 25, 1934, a contract was signed, under the terms of which PWA was to purchase bonds in the amount of $120,000 and to make a grant of approximately 30% of the construction costs. Under this contract the city was required to insert in its construction contracts numerous provisions in regard to materials, wages, hours, working conditions, etc., and was to give PWA the right to supervise the construction of the entire project. The power company then filed suit in the District Court of the United States for the Southern Division of the Eastern District of Missouri seeking to enjoin the carrying out of this contract. The district court sustained a motion to dismiss and the plaintiff appealed to the Circuit Court of Appeals for the 8th Circuit, which reversed the judgment holding the agreement between the city and PWA to be invalid because it constituted an unlawful delegation of the city's governmental powers to the federal agency. [Arkansas-Missouri Power Co. v. City of Kennett, Missouri, 78 Fed. (2d) 911.] Motion for rehearing in that case was overruled on October 9, 1935, and within a month thereafter the aforesaid contract between the city and PWA was formally rescinded. A year later, October, 1936, PWA made another offer to the city, somewhat similar in terms to the one which had been held invalid but omitting certain of the objectionable features of the first contract. This offer was accepted by Ordinance No. 138 within a few days. In the meantime, in pursuance of the original PWA contract, the city had let a certain construction contract to the Fairbanks Morse Construction Company, which company is now a defendant herein. This contract, however, was also rescinded (Ordinance No. 139, April 20, 1937).

In December, 1937, the city council, without holding any hearings thereon, purported to adopt a schedule of minimum wages to be applied in the construction of the project. It shortly thereafter approved a

set of plans and specifications containing the wage schedule adopted and certain restrictions on hours of work. Within a short time thereafter (March 31, 1938) this approval was rescinded. The council then held formal hearings on the question of a minimum wage scale and listened to the testimony of a number of witnesses. After such investigation it again adopted a scale. New plans and specifications were prepared by engineers representing the city which contained the minimum wage scale adopted after the above mentioned investigation and also certain regulations as to hours of work, working conditions, etc. Bids based upon these specifications were called for.

On June 9, 1938, PWA made a third offer to the city. Under the terms of this offer PWA was to purchase the major part of the bond issue and to make a grant of $40,000. On the following day an ordinance was adopted rescinding the 1936 contract between the city and PWA, and a *motion* was passed in the council to accept the new PWA offer. No ordinance of acceptance, however, was adopted and no written contract executed. A few days later the city entered into certain contracts with some of the defendants herein, calling for the erection by them of the power plant and distribution system and containing minimum wage and maximum hour regulations as aforesaid. These contracts, however, did not provide for any control over the work to be exercised by PWA, nor did PWA ask for any such control in the last offer made to the city.

Plaintiffs' bill seeks to enjoin: (a) the carrying out of the "contract" between the city and PWA and the sale of bonds to PWA and the acceptance by the city of the above mentioned grant; (b) the carrying out of the construction contracts; (c) the erection of the light plant with money derived from the bond issue.

The regularly executed contract, first made between the city and PWA, was held invalid by the Federal Court and was later expressly rescinded by the parties. The second contract was likewise expressly rescinded. So it is obvious that no contract between PWA and the city exists, because none could grow out of the offer of 1938 and the purported acceptance thereof by mere motion. Section 3349, R. S. Mo. 1939 (Sec. 2962, Mo. Stat. Ann., p. 1827), prohibits the making of a municipal contract unless the same is reduced to writing and signed by the duly authorized agents of the parties. We have held this requirement to be mandatory and that a purported contract made in disregard of it is void. [Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S. W. (2d) 332.] There is, therefore, no contract at all between the City of Kennett and PWA. Since there is no contract ▮▮▮ the circuit court could not enjoin its carrying out. However, an injunction might issue forbidding the city to perform certain acts which it attempted to perform under the terms of a purported but void contract, provided that those acts, in themselves, were unlawful or would be unlawful to perform in the absence of a

valid contract requiring them. The specific acts here involved are: (a) the erection of a power plant and distribution system; (b) the sale of certain bonds to the federal government; and (c) the receipt of the grant from the federal government.

It is not contended that the city was without the right to build a power plant of its own. Had there been no connection whatever between the city and PWA and had the city planned to build this electric system with money derived from taxation or with the proceeds of a lawful bond issue sold to private individuals or banking corporations, its right so to do would be unquestioned. But, if the city had the power to sell its bonds to private corporations or individuals, it also had the power to sell the same to the federal government. In the same manner it is unquestioned that a city has a right to receive gifts of money or property from an individual and by the same token it would have a similar right to receive a grant from the United States. Of course, if the purchase of bonds by PWA or the making of a grant by such agency involved an agreement by the city to delegate to the federal government a substantial amount of the power vested in the municipal authorities by the constitution and statutes of this State, the entire agreement would be invalid. [Arkansas-Missouri Power Co. v. City of Kennett, Missouri, supra; Aquamsi Land Co. v. City of Cape Girardeau, supra.] But, as we have pointed out, there is no agreement between the city and the federal government and even if the last PWA offer had been accepted by ordinance and embodied in a signed contract, that offer did not contain any provisions for a delegation of supervisory control.

We turn now to the question of whether the city can be enjoined from carrying out the construction contracts entered into with private building concerns. In the first place it is contended by the plaintiffs that those contracts are void because they contain minimum wage and maximum hour requirements. The hourly wage set for common labor under the construction contracts is twenty-five cents. There is some evidence in the record to show that the prevailing wage for such labor was twenty cents or at least that some common labor was available at a twenty cent rate. On the other hand, there is considerable evidence upon which the chancellor could find that the prevailing wage was twenty-five cents and that satisfactory common labor could not be obtained for less. Plaintiffs contend that Kennett, as a city of the third class, is without power to establish a schedule of minimum wages and maximum hours to be enforced upon a municipal project. We are not concerned with the question of whether the city could establish such regulations in regard to contracts where only private companies and individuals were involved. Our present concern is with the power of the city to regulate these matters in a construction project which was being erected for and financed by the city itself, and we are first called upon to determine whether or not there is any

constitutional prohibition against such regulations. If such constitutional prohibition does not exist, it will be necessary to determine whether the statutes of the State which constitute the charter of the City of Kennett have conferred specifically or by necessary implication the power on the municipal corporation to make such rules. It is true that at one period in our judicial history statutes and ordinances which attempted to fix maximum hours of employment or to establish minimum wage scales were frowned upon by the courts as an invasion of that freedom of contract which is admittedly a part of the liberty guaranteed to our citizens by the Fourteenth Amendment to the Constitution of the United States. [Lochner v. New York, 198 U. S. 45, 49 L. Ed. 937, 25 Sup. Ct. 539, 3 Ann. Cas. 1133; Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, 43 Sup. Ct. 394, 24 A. L. R. 1238.] The case of Street v. Varney Electrical Co., 160 Ind. 338, 61 L. R. A. 154, upon which great stress is laid by the plaintiffs, is typical of the judicial attitude prevailing at that time.

However, the more liberal views expressed in the dissenting opinions of Chief Justice TAFT and Justice HOLMES in the Lochner and Adkins cases, supra, have now met with general judicial approval. [West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 Sup. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330.] Since the decision of this last-mentioned case the regulation of wages and hours, even in private industry, has become a well-recognized function of the federal government. [Cf. Fair Labor Standards Act of 1938, 29 U. S. C. A., Sections 201 to 219; Jacobs v. Peavy-Wilson Lumber Co., 33 Fed. Supp. 206; Morgan v. Atlantic Coast Line R. Co., 32 Fed. Supp. 617; United States v. Darby Lumber Co., 32 Fed. Supp. 734; Andrews v. Montgomery Ward & Co., 30 Fed. Supp. 380.] It is argued by the plaintiffs that these cases all involve regulation of wages and hours by statute and not by ordinance. But, for the moment, we are considering the constitutionality of such regulations under the due process clause. Assuming for the moment that a municipality has charter powers sufficient to adopt the regulations involved, they would be valid as against an attack based upon the due process clause, if a *state statute* of similar import would be valid.

Even during the period when the rule of the Lochner case was still recognized in its full vigor, a distinction was drawn between wage and hour standards applied to general industry and those adopted for public or municipal contracts. The latter type of regulations was universally recognized as constitutionally valid. [Atkin v. Kansas, 191 U. S. 207, 48 L. Ed. 148, 24 Sup. Ct. 124.] The basis of this distinction is simple. One who voluntarily enters into an agreement with a governmental agency accepts his contractual rights subject to such conditions as the government sees fit to impose. These conditions, being voluntarily assumed, do not deprive him of his freedom of contract. [Perkins v. Lukens Steel Co., 310 U. S. 113, 84 L. Ed. 1108.]

■■ But plaintiffs say, and we think correctly so, that since a municipal corporation is a mere creature of the State and not in itself sovereign, it can exercise only such powers as have been specifically conferred upon it by special charter or general law and either in express terms or by reasonable implication. [State ex rel. v. Anderson (Mo. App.), 101 S. W. (2d) 530; State ex rel. City of Blue Springs v. McWilliams, 335 Mo. 816, 74 S. W. (2d) 363; City of St. Louis v. Dreisoerner, 243 Mo. 217, 147 S. W. 998, 41 L. R. A. (N. S.) 177.] Based upon this established premise, plaintiffs argue that there is nothing in our statutes giving to cities of the third class the power to adopt wage and hour ordinances with reference to municipal contracts. The charter of such cities is to be found in the general laws of this State. [Articles 5 and 11, Chap. 38, R. S. Mo. 1939.]

The fallacy of this argument lies in the fact that it ignores the principle that where a corporation, private or municipal, is given power to perform a certain act, it is necessarily left with large discretion as to the method to be adopted and the manner in which such act is to be performed. [Sylvester Watts Symth Realty Co. v. American Surety Co., 292 Mo. 423, 238 S. W. 494; State ex inf. Harvey v. Missouri Athletic Club, 261 Mo. 576, 170 S. W. 904, L. R. A. 1915C, 876, Ann. Cas. 1916D, 931; Aurora Water Co. v. City of Aurora, 129 Mo. 540, 31 S. W. 946; Taylor v. Dimmitt, 336 Mo. 330, 78 S. W. (2d) 841, 98 A. L. R. 995; Marion v. Sneeden, 291 U. S. 262, 78 L. Ed. 787, 54 Sup. Ct. 421; Pixley v. Western Pacific R. Co., 33 Cal. 183, 91 Am. Dec. 623.] As stated, we think it to be conceded that the City of Kennett *unquestionably* has power to build, own and operate a municipal power plant. It necessarily follows that it has the power to enter into a contract with a builder or construction company for the erection of such plant. The exact terms and provisions to be inserted therein must, in the nature of things, vary with the particular conditions surrounding this specific project. Such a contract must necessarily contain all reasonable provisions, not forbidden by the State or federal constitution or the charter of the city or general State law, which have a tendency to effectuate the object involved. It is a well-recognized principle of economic management that more efficient work will be performed by employees whose hours of labor are limited to a reasonable maximum and who are paid a reasonable minimum wage. Thus the inclusion of such provisions in a municipal construction contract directly tends to promote efficiency and to secure economical and satisfactory construction. We think that the power to include such provisions in a construction contract is a necessary incident of the power to make the contract itself.

Plaintiffs argue that the power to make such regulations is specifically granted to cities of the second class by Sections 6840 and 6841, R. S. Mo. 1939 (Secs. 6712, 6713, Mo. Stat. Ann., p. 5583), and that upon the doctrine of *expressio unius* it is thereby denied to cities of

the third class. But plaintiffs do not properly read the cited sections. They do not confer a grant of power or the contrary; they simply impose statutory restrictions upon the manner in which certain powers are exercised. Their existence is entirely consistent with the legislative intent to leave questions of wages and hours under municipal contracts in cities of the third class to the discretion of the regularly elected authorities of such cities.

Plaintiffs contend, however, that the present case is ruled by our decision in Hillig v. St. Louis, 337 Mo. 291, 85 S. W. (2d) 91. That case, however, is clearly distinguishable from the one at bar. Our decision therein was based solely on the provisions of Sec. 4 of Art. 22 of the Charter of St. Louis which required that all public works contracts be let "to the lowest responsible bidder." We held that the inclusion of minimum wage scales in the specifications on which proposals were to be submitted introduced an element other than that of responsibility and thereby illegally restricted the bidding. [St. Louis Quarry and Construction Co. v. Frost, 90 Mo. App. 677; Allen v. Labsap, 188 Mo. 692, 87 S. W. 926, 3 Ann. Cas. 306; St. Louis Quarry and Construction Co. v. Von Versen, 81 Mo. App. 519.] Cases from other jurisdiction have adopted a similar view where a statute or charter unequivocably required the letting of public contracts to the lowest bidder. [Bohn v. Salt Lake City (Utah), 8 Pac. (2d) 591, 81 A. L. R. 215; Wilson v. City of Atlanta (Ga.), 139 S. E. 148.] But, in the absence of a statute or charter provision so requiring a letting to the lowest bidder, a different result is reached in some of the better reasoned cases. [Memphis Power & Light Co. v. City of Memphis (Tenn.), 112 S. W. (2d) 817.] Plaintiffs have not cited us to any statutory provision applicable to cities of the third class requiring the letting to the lowest bidder. Furthermore the record in this case shows that the city would receive by grant from the national government a sum greatly in excess of the amount by which bids could possibly have increased owing to the minimum wage provisions in the specifications. While it is true that the amount received by the individual workman might be somewhat increased because of these provisions, this would be offset by the amount of the grant from the federal government. While the money received from the grant is not to be earmarked for the payment of wages, still the final result will be that the city is a mere conduit through which the federal money is paid out to these workmen. The taxpayers cannot be injured thereby. [Iowa Electric Co. v. Town of Cascade (Iowa), 288 N. W. 633.] Furthermore, as pointed out, it is the considered opinion of economists that efficiency in construction operation will be greatly increased when a reasonable minimum wage scale is adopted, as the better class of workmen will be attracted thereby and inefficient workmen will be unable to compete for employment. This was a matter

to be weighed and determined by the properly constituted municipal authorities. The court cannot substitute its judgment for theirs.

What we have just said disposes of the contention that the plaintiffs, as taxpayers, are being deprived of their property for the purpose of making a municipal gift to the workmen involved. No deprivation of property, as forbidden by the Fourteenth Amendment, exists, for the reason that enough will be received from the federal grant to make the taxes exactly what they would have been if neither the grant nor the minimum wage scale had been present. And, furthermore, even should the grant not be received, the increased efficiency brought about through the inclusion of these labor provisions would reduce rather than increase the total cost of construction. At least it was for the municipal authorities to determine whether or not this would be true.

Plaintiffs strongly contend that the inclusion of these provisions in the contract was made at the request of PWA, and that this constituted a delegation of the city's governmental powers to that agency. In this connection they rely strongly upon the Aquamsi case, supra, and the case of Arkansas Missouri Power Co. v. Kennett, supra. Those cases held, and rightly held, that the municipal authorities cannot delegate their power to another. But, as we have pointed out, there is no contract here delegating any power of supervision to the federal government. Even though it be true that the federal government asked that certain provisions be inserted in the construction contracts, still it was the city and the city alone which drew those contracts and inserted those provisions. The federal government did not ask and did not get any power of supervision over this work. Its sole relation to the work was this: that it lent certain money to the city to be used under the city's sole supervision in constructing the plant and that it made a gift to the city for the same purpose. ▮▮▮ There is certainly no delegation of municipal power here involved.

▮▮ Plaintiffs contend that even though the city had power to adopt a minimum wage or maximum hour schedule applying to all municipal contracts, that it had no such power to single out a specific contract and apply such regulations thereto. Such a singling out of a specific contract is said to constitute a local or special act of legislation violative of Section 53 of Article 4 of the State constitution. That this article applies to city ordinances as well as to State legislation is conceded. [City of Springfield v. Smith, 322 Mo. 1129, 19 S. W. (2d) 1, l. c. 3; Ex parte Lerner, 281 Mo. 18, 218 S. W. 331.] But we are of the opinion that these provisions are not violated in the present case. The city council is both a legislative and an administrative body. Its present action was not of legislative nature. It was administrative. As an administrative body it performs the functions of a board of directors of the municipal corporation. It was its right and duty to fix the terms of each contract adopted for the erection

of municipal improvement. In the very nature of things those terms vary from time to time. It may be highly important in a complex and difficult construction project like the present to make certain that the most efficient and best labor will be employed. Such considerations may be of no importance in smaller and simpler projects. We think that the council was properly exercising its discretion in this matter.

██ Finally, it is contended by the plaintiffs that the general conditions in the city have so changed since 1933 as to require a new submission of the bond issue proposition to the electorate. The evidence was offered showing an increase in the city's population between the Federal Census of 1930 and that of 1940. Plaintiffs sought to show that the contemplated plant and distribution system would be inadequate to supply the needs of all potential users of electric energy in the corporate limits. It is said that the electorate, in authorizing the present bond issue, had in mind the erection of a system which, without the aid of any competitive privately owned utility, should supply all users. But there is not the slightest evidence that the question was actually submitted on that basis. Absent any charge of fraud, we must take it that the voters authorized the issuance of bonds to erect such a system as could be obtained for the funds which they made available. [Missouri Service Co. v. City of Stanberry, 341 Mo. 500, 108 S. W. (2d) 25.] Besides this, the evidence does not show such a radical change in conditions that we may say that the council, in proceeding without resubmission, was abusing its discretion. Again we point out that this court may not substitute its judgment in administrative matters for that of the administrative officials to whom the people of the city have entrusted the management of its affairs.

We have completely examined the lengthy record in this case in the light of all of the contentions made by counsel and have read the many authorities cited in their briefs, but we are constrained to hold that the decree passed by the learned chancellor below was rightly entered for the defendants. The judgment of the circuit court must be affirmed. It is so ordered. All concur.