WEST VIRGINIA COAL COMPANY OF MISSOURI, Appellant, v. CITY OF ST. LOUIS.—25 S. W. (2d) 466.

Division One, March 5, 1930.

*Case, Voyles & Stemmler* for appellant.

*Julius T. Muench* and *Oliver Senti* for respondent.

LINDSAY, C.—This is an action for damages sought to be recovered on the ground that defendant city breached a contract made with plaintiff, for the purchase of 15,000 tons of coal screenings at $6.50 per ton, for the city waterworks. The cause was tried to the court and judgment went in favor of defendant. The plaintiff submitted its case upon an agreed statement of facts, and then defendant's offered demurrer being denied, the city submitted its defense upon an additional agreed statement of facts. These statements were taken subject to objections as to their competency, respectively reserved and made by the parties. The city owns and operates its waterworks system, and in connection therewith operates a pumping plant—at Bissel's Point, Baden, and the Chain of Rocks on the Mississippi River—and required and used large quantities of coal and coal screenings.

The various acts entering into the transaction as shown in the agreed statement, in their chronological order, are as follows:

On the 1st day of September, 1920, the Assistant and Acting Water Commissioner for the city, by letter, submitted to the Supply Commissioner of the city requisitions covering coal required for the operation of the waterworks for the month of September, 1920. The requirements stated were, for Baden, 2300 tons, more or less; for Bissel's Point, 2300 tons, more or less, and for the Chain of Rocks 2,000 tons, more or less. The Assistant and Acting Water Commissioner stated in said letter, that the contract of the city with the St. Clair Coal & Mining Company had expired on the day before; that the present available supply of coal at the waterworks was sufficient to operate for not more than ten days, and that it was urgent that daily shipment of coal at the rate of six cars per day be renewed with the least possible delay.

On the 3rd day of September, 1920, the Supply Commissioner called up the Comptroller of the city on the telephone, and stated to him that Sunday and Labor Day were coming on; that there was a shortage of coal screenings at the waterworks; that it was imperative that they purchase coal right away, and that he had an opportunity to buy 15,000 tons of coal screenings from the West Virginia Coal Company, at $6.50 per ton. The Comptroller replied that the price was almost prohibitive, but, if the situation was as serious as the Supply Commissioner said it was, to use his own best judgment, and whatever he did would be satisfactory to him, the Comptroller. On the 4th day of September, the Supply Commissioner of the city transmitted to the plaintiff by letter the following order or communication, addressed to the plaintiff:

"This is your authority to proceed as per verbal conversation of today and yesterday to place at the Water Works 15,000 tons of 1½" screenings at $6.50 per ton, f. o. b. mines. . . . Please proceed as promptly as possible, and advise me personally of the deliveries you are making. JOSEPH B. THOMAS, Supply Commissioner."

Also on the 4th day of September, the plaintiff transmitted to the Supply Commissioner its "Acknowledgment of Order" of coal, for account of the city for shipment to the Water Works, stating it as "15,000 tons SCRGS. 1½ f. o. b. mines at $6.50." This acknowledgment among other things under the head of "Remarks," contained the following: "The order has been accepted and entered subject to the following conditions of sale.—This company shall not be liable for contingencies of transportation or mining. Orders acknowledged subject to our ability to get the proper equipment to go the route."

On the 7th day of September, 1920, the Water Commissioner learned of the order aforesaid, and on that day informed the Supply Commissioner that the water department would not accept any shipments under that order.

The first cars of coal shipped by the plaintiff under the order, reached the waterworks on the 8th day of September, 1920, and the water department refused to accept the same. Cars of coal continued to arrive until the 15th day of September, 1920, but no coal was accepted until the 15th day of September. On that day, the Supply Commissioner at the direction of the Mayor of the city delivered to plaintiff a letter of that date saying: "The order given you on September 4th, 1920, for 15,000 tons of screenings for the Water Works is hereby cancelled."

Following the notice above quoted, no other coal was shipped by the plaintiff. It is conceded that further shipments, if made, would not have been accepted. The city, on said 15th day of September, accepted the coal shipped, and received up to that time, a total of 2586 tons, and afterward paid plaintiff for the same at $6.50 per ton. The market price of such coal to general consumers in St. Louis on that date was $4 per ton and that continued to be the price through the month of September, 1920. It was agreed that on the 4th day of September there was on hand and available for use at the pumping plants of the city, 3,000 tons of coal and coal screenings, estimated by the Water Commissioner to be sufficient to operate the plants for approximately fifteen days.

No bond was given by the plaintiff for the performance of the contract.

It was agreed that all provisions of the charter and all ordinances of the city be treated and considered as offered in evidence by either plaintiff or defendant.

The pleadings of the parties reflect their respective theories—their construction of the charter and statutory and constitutional provisions; and, theories of the effect of what took place between the officials of the city and the plaintiff.

The plaintiff's petition alleges that on September 4, 1920, the city was running short of coal screenings necessary to operate its waterworks, and pleads the operation and effect of Section 261, Revised Code of General Ordinance 1914, which it is alleged provided that the Supply Commissioner of the city should purchase all articles needed by the city in its several departments in such manner and under such regulations as might be provided by ordinance, and as far as practical by advertisement for proposals to furnish same; that said ordinance also provided the method for advertisement, and provided that whenever the Commissioner should purchase any supplies without advertisement for proposals, such purchase should be approved by the Comptroller and be binding upon the city; that on the date mentioned, the necessity for obtaining a supply of coal screenings was so great it was impractical to advertise for bids and proposals for the same, and the Supply Commissioner of the city entered into a contract by letter, placing the order with the plaintiff, and that plaintiff accepted the order; that at the time the Supply Commissioner made such contract he submitted the same to the Comptroller of the city and received the Comptroller's consent to the making of said contract. The plaintiff then alleges the making of deliveries of coal up to the 15th day of September, and the notification on that date of cancellation by the city.

The answer, after a general denial, specifically denied that the Supply Commissioner of the city was authorized by said Section 261 or by any other ordinance to enter into a contract on behalf of the city by letter—by placing the order in question—and averred that the authority of the Supply Commissioner and all other officers of the city who entered into contracts for and on its behalf is subject to limitations, imposed by Section 48 of Article 4 of the Constitution of Missouri, by Section 2164, Revised Statutes 1919, and by Section 9 of Article 25 and Section 29 of Article 15 of the Charter of the city, and that the act of the Supply Commissioner in ordering by letter the coal screenings from the plaintiff, if made, did not constitute the making of a valid and binding contract, said acts being in violation of the charter, and of the other provisions statutory and constitutional. The answer further alleged that under Section 29 of Article 15 of the Charter, the Supply Commissioner was without authority to contract for or purchase on the city's behalf coal screenings in an amount exceeding $500 on any one contract, without advertising for competitive bids therefor, except in case of emergency to be determined by the Board of Standardization of the city; that

the Supply Commissioner did not advertise to secure competitive bids for ordering said coal screenings, and the city's Board of Standardization did not determine that an emergency existed before said coal screenings were ordered. The answer further pleaded that under the provisions of Section 9 of Article 25 of the Charter, all contracts relating to the city's affairs must be executed in its name; that in cases not authorized and provided by ordinance, such contract should be made by its Comptroller, and all contracts not made by its Comptroller shall be countersigned by him; that the alleged contract was not executed in the name of defendant, and was not made or countersigned by the Comptroller. The answer next averred that on the 4th day of September, 1920, the city had on hand for the use of its Water Works about fifteen days' supply of coal screenings, exclusive of shipments en route to its Water Works; that such shipments were being received by the defendant immediately prior to and immediately subsequent to the 4th day of September, and that no emergency, within the meaning of Article 15, Section 29, of the Charter, existed on said date, or at the time defendant refused to accept further shipments; and further that neither the Supply Commissioner nor any other officer of the city had at the time authority by law to order 15,000 tons of coal screenings without advertising to secure competitive bids, and that the acts of the Supply Commissioner did not constitute a valid and binding contract on the part of the city to accept, receive and pay for said coal screenings.

The reply, after a general denial, specifically denied the various allegations of the answer heretofore indicated. The reply next pleaded that defendant was engaged in the business of selling water for compensation and profit and in pursuance of such business, executed the contract and order, and accepted part delivery of coal thereunder; that if said contract or order was not entered into by the city in conformity with the provisions of the laws and charter relating to the execution of contracts and the solicitation of bids, the city was estopped by its own act to now say that such requirements, if any, were not complied with by its officers.

The court made certain findings of facts, and also gave certain declarations or conclusions of law at the request of plaintiff, and denied others requested, and gave also certain declarations or conclusions of law requested by defendant. Upon these are founded plaintiff's assignments of errors, and the points sought to be made. The points urged are to be considered in view of the provisions of the Charter concerning the powers of the Supply Commissioner in the purchase of supplies, and other provisions prescribing the manner of making contracts for the city.

The manner of the purchase of supplies is set forth in Section 29 of Article 15 of the Charter of the city, which is as follows:

"Supplies for all departments, boards or offices, exclusive of material for public work or improvements, shall be purchased only through the supply division, according to such standards and specifications, if any, adopted or prepared by the Board of Standardization, and by advertising for proposals therefor. Bids may be for one or more, or all the articles advertised for, but there shall be a specific bid on each article. The award may be made to the lowest bidder for any article or to the lowest bidder for the entire requisition or any part thereof; but the Board of Standardization may reject any or all bids, or any part of any bid. The Supply Commissioner may contract for supplies in any amounts or for any periods as may be approved by the Board of Standardization, and subject to the provisions of this charter. In cases of emergency, to be determined by said board, purchases may be made without advertising. Purchases in amounts not exceeding five hundred dollars under any one contract may also be made, with the written approval of the Comptroller, without advertising, after securing competitive bids, but there shall be no division of requisitions or contracts for the purpose of securing this privilege. The Supply Commissioner shall inspect and receipt for all supplies.

"Supplies shall not be ordered or contracted for by the supply division unless the Comptroller shall certify that a fund is applicable for payment thereof."

The section purports to cover the subject of the purchase of supplies and the various provisions therein are to be considered together. The first sentence of the section is all-inclusive, but there are two exceptions farther along in the body of the section. It is required that "supplies . . . shall be purchased only through the supply division, . . . and by advertising for proposals therefor." To the requirement of advertising for proposals, there are two exceptions and no more: (1) In cases of emergency, to be determined by the Board of Standardization; and (2) purchases in amounts not exceeding $500 under any one contract, with the written approval of the Comptroller, after securing competitive bids. There was neither advertising for proposals nor competitive bids in this case. The amount of the purchase provided was $97,500. Counsel stress the following provision of the section: "The Supply Commissioner may contract for supplies in any amounts or for any periods as may be approved by the Board of Standardization, and subject to the provisions of this charter." This provision when considered with what precedes and what follows it cannot be construed to be an exception to the requirement of advertising for proposals, and of competitive bids. No other pro-

vision of the Charter is pointed out giving the Supply Commissioner with the approval of the Board of Standardization, the broad power to purchase supplies in any amount and for any period, without advertising and without competitive bids, and without determination of an emergency by the Board of Standardization. It is the duty of that board to "classify and standardize all supplies and materials purchased by the city or used for municipal purposes and to prepare precise specifications for all supplies to be purchased through the supply division." It is authorized to maintain such laboratories or other methods of testing as may be necessary (Section 28 of Article XV of the Charter). That section provides that the Comptroller, Supply Commissioner and President of the Board of Public Service, shall constitute the Board of Standardization.

The petition does not allege there was an emergency determined by the Board of Standardization, but states there was a shortage of coal, and it was impracticable to advertise for bids, and refers to Section 261 of the General Code of Ordinances as authority for purchase by the Supply Commissioner of supplies, "as far as practicable, by advertisement for proposals to furnish the same;" but, the case was tried and is presented here by plaintiff on the theory there was an emergency, and that there was an informal determination thereof by the Board of Standardization, through the conversation between the Supply Commissioner and the Comptroller. Under the provision of the Charter, the determination of an emergency by the Board of Standardization was a prerequisite to the right to purchase in the amount here in question, without advertising for proposals. Counsel for plaintiff suggest that there is no provision specifying how the Board of Standardization shall function, or requiring that a record of its proceedings shall be kept. By the Charter, the three officials constitute a board, charged with important public duties and clothed with large powers in respect to the purchase of all supplies and materials, to be purchased by the city or used for municipal purposes. We think the nature of the duties of this board requires it to keep a record of its proceedings. [Larned v. Briscoe, 62 Mich. 393.] It certainly was not contemplated that the evidence of exercise of the power—to classify and prepare standards and precise specifications for all supplies and materials, to reject any and all bids, to approve purchases made by the Supply Commissioner, and to determine that an emergency exists, which dispenses with the requirement of advertising for proposals—should be left to fugitive memoranda or the recollection of informal conversations over the telephone.

The requirements of a valid contract by a municipality are stated in Section 2164, Revised Statutes 1919, as follows:

"No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

The provisions of that section apply to the city of St. Louis, as well as to other cities. [Mullins v. Kansas City, 268 Mo. 444, 458; Heman Construction Co. v. St. Louis, 256 Mo. 332.]

The charter provision of the city of St. Louis concerning the making of contracts is Section 9 of Article 25, which is as follows:

"All contracts relating to city affairs shall be in writing, signed and executed in the name of the city. In cases not otherwise provided by law or ordinance, they shall be made by the Comptroller, and in no case by the Board of Aldermen, or any committee thereof. Contracts not made by the Comptroller shall be countersigned by him, and all contracts shall be filed and registered by number, date and contents with the register."

In this case the contract, or order given, was not signed and executed in the name of the city. It was not signed or countersigned by the Comptroller. The order does not purport to be given upon an emergency determined by the Board of Standardization. Counsel for plaintiff argue that Section 2164 of the statute does not require a formally executed instrument, and that Section 9 of Article 25 of the Charter is susceptible of the like construction. Certain cases are cited: California v. Telephone Co., 112 Mo. App. 722; Saleno v. Neosho, 127 Mo. 627; Aurora Water Co. v. Aurora, 129 Mo. 540. These were cases wherein a company had filed its written acceptance of a franchise granted by the council of a city, in accordance with the provision to that end, contained in the ordinance. We are unable to see the application of the holding in those cases, to the facts, and to the requirements of the Charter concerning the purchase of supplies, involved in this case. In the cases mentioned the grant of the franchise was the exercise of a power by the council or board of aldermen expressed by an ordinance. The question here refers to the power of a ministerial officer to make a contract under certain conditions.

Counsel for plaintiff argue that in any event the execution of an order for supplies by the Supply Commissioner in his name as such officer, was the act of the city, and a sufficient compliance with the requirement that the contract be signed by the party to be charged. Several cases from other jurisdictions are cited but no decision of any appellate court of this State is cited.

We find nothing in the cases cited which we regard as authoritative or persuasive in the face of the express provisions of the charter and the statute applicable in the instant case.

It is further urged that unless the charter provisions in regard to purchasing supplies are mandatory in respect to advertising, a letting by competitive bids is not required, and under that, attention is called to 3 McQuillin on Municipal Corporations (1 Ed.) sec. 1186. The provisions in the charter requiring advertising for proposals are expressive of the policy of the city, and are mandatory, with the two exceptions heretofore pointed out, the one applicable to purchases in an amount not exceeding $500, the other to purchases in an emergency, to be determined by a board having express authority to make such determination. Such a contract could be authorized only through the determination that an emergency existed, and it was that determination only which could authorize the making of the contract; and, under the provisions of Section 2164 prescribing the requirements of such a contract, it was necessary that in the making of it the officer or agent of the city executing the contract for the city, be "authorized by law . . . and authorized in writing."

In 44 Corpus Juris, page 83, Section 2153, it is said:

"Any officer assuming to bind the municipality by contract must possess express authority for his power thus to represent the corporation in a contractual relation, and a contract made without authority will not bind the municipality, unless later, the officer receives such express authority and then ratifies the contract, or unless the unauthorized contract is ratified by some other board or officer having authority to make it, or unless, as often happens in the case of contracts made without authority in time of emergency, the subsequent conduct of the city authorities is held to constitute a ratification. The instrument purporting to grant the officer authority to contract for the city will be strictly construed."

It is argued that where a contract is within the charter powers of a city, the city, even in its governmental capacity, where it has received the benefits, may be estopped from setting up mere irregularities in the exercise of the powers conferred and that such contracts may be ratified. Our attention is called to State ex rel. v. Milling Co., 156 Mo. 620; City of Unionville v. Martin, 95 Mo. App. 28; Union Depot v. St. Louis, 76 Mo. 393; Cole Co. v. Trust Co., 302 Mo. 222. The case is distinguishable from most of the cases, because, in most cases the estoppel determined against the city is based upon the fact that the city received and wholly retained the benefits of the contract, waited long before questioning the validity of the contract, and could not restore to the other party what had been received under the con-

tract. The same underlying fact appears in most of the cases cited under the further contention of the plaintiff that the city when acting within its charter powers and in its private as distinguished from its governmental capacity, may be estopped by the action of its officers and agents; and some of the cases were actions in tort. [Brewing Association v. St. Louis, 140 Mo. 419 is cited.] The question involved, was the validity of rates charged for water furnished by the city. It was held that in furnishing water the city was acting in a private rather than in a governmental capacity, and had the same right to make reasonable charges therefor as a private corporation might make. The case does not raise the question at issue in the instant case. Reed v. City of Mexico, 110 Mo. App. 155, is cited. That was an action for damages for personal injuries. The city, by ordinance, had prescribed the size and character of sidewalks to be constructed on certain streets and afterward the council permitted, but not by ordinance, an inferior walk to be constructed. In the opinion, certain observations are made as to the liability of cities for the results of their acts done in a proprietary capacity. Cole County v. Central Mo. Trust Co., 302 Mo. 222, is cited. In that case the defendant held certain of the money of the county, under an arrangement whereby it issued time certificates for the money, paying interest thereon at 4¾ per cent. Afterward, the county demanded and sued for interest at 2.15 per cent on daily balances. The county was seeking recovery as upon a contract, which in fact, had never been made. The defendant had fully performed the irregular and illegal contract made, and the county had received and retained the benefit thereof—a greater benefit it was said, than it would have received had the money been let under the statutory method. It was held that the county having accepted all the benefits of an illegal contract actually entered into and fully performed, could not recover upon a contract not entered into. Counsel cite Boothe v. City of Fulton, 85 Mo. App. 16. The case had no element of contract in it. The plaintiff was asking damages on the ground that the construction and operation of an electric and water plant by the city on the lot adjoining plaintiff's dwelling house, rendered his property worthless. There are some cases cited from other jurisdictions which hold that in respect to contracts referable to the business functions of a municipal corporation (as the operation of a water plant), restrictions upon the power of the corporation to contract will be construed to be directory merely, and failure to observe the same will be construed to constitute an irregularity which can be cured by the application of the doctrine of estoppel. Certain cases to that effect are cited in the Annotation in L. R. A. (N. S.) 1915A, at page 994. Des Moines v. Welsbach Light Co., 110 C. C. A. 540; Diamond Power Specialty Co. v. City of West Point, 11 Ga.

App. 533, are cases of that character. In those cases, however, the city retained the materials and appliances purchased, as things incorporated in and made part of the plant operated.

There runs through the brief of the plaintiff the contention that the plaintiff did not in fact know the provisions of the charter, nor the method of making contracts and transacting business by the city. The general rule is that one contracting with a municipal corporation is bound to take notice of the limitations of its power, and also of the power of the particular officer or agent undertaking to contract for the city. [McQuillin on Municipal Corporations (2 Ed.) sec. 1268; Dillon, Municipal Corporations. (5 Ed.) sec. 777; Pryor v. Kansas City, 153 Mo. 135.] The rules applicable in several respects to the case at hand, and substantially controlling herein, were stated in the opinion in Mullins v. Kansas City, 268 Mo. 444. There, the city was constructing its water plant, and the plaintiff contracted in writing to construct the settling basin. The contract recited that it was expected that the earth for the construction of the embankment would be procured on property owned by the city, or property to be secured by the Board of Fire and Water Commissioners. The plaintiff obtained a part of the earth needed from a near-by hill, but it was discovered that the earth therefrom was not of the proper quality for the construction of an embankment. The city purchased another hill at some distance away and plaintiff was directed to procure earth from that hill, entailing a greater expense than would have been incurred in obtaining the earth from the first hill. The plaintiff's contention was that he was told by the board to use earth from the more distant hill, and he would be paid for the extra work required. Plaintiff's suit was based upon violation of an alleged oral agreement. The principal question discussed in the opinion was whether the city was subject to an estoppel, and in the discussion full force is given to the statute concerning the requirements of contracts by municipal corporations. The court said:

"So the discussion recurs to the sole point left: Is the defendant city estopped by the acts of its Fire and Water Board from raising the question of the invalidity of its oral agreement with plaintiff? We do not think it is. We recognize that the modern doctrine is tending more and more toward the view that a municipality, no more than an individual, ought not to be allowed so to act toward others as to induce them to pursue a course harmful to them and then in the end refuse to comply with the promise inducing such action, so as to save harmless him who was hurt by reliance on the promise made. But will such a doctrine apply in the very teeth of a public statute which expressly forbids the making of the promise, or contract, in the manner in which it was made here?

"The cases found in this State wherein what for convenience is called estoppel, was successfully invoked against municipalities, will be found to fall largely, if not entirely, into that branch of estoppel called laches. [Boone County v. Railroad, 139 U. S. 684; Simpson v. Stoddard County, 173 Mo. 1. c. 466; Dunklin County v. Chouteau, 120 Mo. 577; 2 Dillon on Mun. Corp. (5 Ed.) sec. 951; Town of Montevallo v. School District, ante, p. 217; City of St. Joseph v. Terminal Railway Co., ante, p. 47.] Cases in other words, wherein through the long neglect of the municipality to assert a legal right and through pursuing for a long time a misleading course of action touching the subject-matter, he who defends for laches was lured to his hurt, so that it would be unconscionable to permit the long dormant right to be asserted as to him who was thus misled. [Simpson v. Stoddard Co., 173 Mo. 1. c. 466; Town of Montevallo v. School Dist., supra; City of St. Joseph v. Terminal Ry., supra.] In the case of Simpson v. Stoddard Company, supra, the idea that such estoppel is of the sort called laches, is expressly recognized; for it is said: 'We take it that it is no longer a disputed question that the doctrine of laches applies to a county or other municipal corporation, as well as to individuals.'

"V. But be this as may be, it is plain that to allow such a doctrine upon a contemporaneous matter to be successfully asserted in the teeth of a statute which forbids, and of which statute plaintiff must be held to know, would be against public policy. Statutes and charter provisions constitute powers of attorney to the officers of municipalities, beyond which such officers may not go. Those dealing with such agents of municipalities must be held to know these statutory and charter powers which effectually limit such officers' powers and radius of action. Officers of municipalities are not general agents; they are special agents, whose duties are set forth in the statutes which create them and which define their powers, and of these statutes, and therefore of these officers' powers, the public which deals with them must take notice and govern themselves accordingly. [Lamar Twp. v. Lamar, 261 Mo. 171; Morrow v. Surber, 97 Mo. 155.] Vain and futile would Constitution and statutes and charter be if any officer of the State, or of a county, or of a city, or other municipality, could follow them only when he saw fit. If by estoppel such salutary provisions, enacted with wise foresight as checks upon extravagance and dishonesty, can be utterly abrogated at will by any officer, such provisions then subserve no purpose and the public corporation has no earthly protection against either greed or graft. [Likes v. Rolla, 184 Mo. App. 296; Cook & Son v. Cameron, 144 Mo. App. 137; State ex rel. v. Dierkes, 214 Mo. 578.]"

Granting that the city in the purchase of supplies for operating the waterworks was acting in a proprietary capacity, yet, the charter

expressly prescribes the conditions under which such purchases should be made, and the charter and the statute prescribe the manner and form of making such contracts. These provisions are matters of public law, and persons dealing with the city in a contractual way are bound to take notice thereof. In this case, the plaintiff asks for recovery of $31,035, that is $2.50 per ton on 12414 tons of coal which the city refused to accept. Essentially the theory of the plaintiff is, that the city, as engaged in the operation of its waterworks, is liable in the manner of a common-law corporation, for a breach of contract.

The plaintiff, over objection of the city, was permitted to include in its statement of facts, statement of purchases by the city of coal without advertising, in the months of July and August, 1920—ordered by the Supply Commissioner, by letter, but with the written approval of the Board of Standardization. Counter to that, the defendant was permitted to include in its statement, as a fact, the purchase and delivery of 3918 tons of coal in September, from companies and persons other than the plaintiff. This was on the theory that the conversation between the Supply Commissioner and the Comptroller could not have constituted, and did not constitute, the determination of an emergency, within the meaning of the charter. Summing up the matter somewhat: It is conceded the order forming the basis of suit was not given pursuant to advertising for proposals, nor upon competitive bids; the determination of an emergency dispensing with advertising, rests upon the conversation between the Supply Commissioner and the Comptroller; neither a contract, nor the order in question, was signed or countersigned by the Comptroller, and no contract was signed in the name of the city; the order did not purport to be the act of the city. The city paid for all coal accepted, at the price mentioned in the order, and the city was not guilty of such laches in cancelling the order as warrants application of the doctrine of estoppel of the city from challenging the validity of the contract, which the Supply Commissioner attempted to make. Estoppel should be applied with caution as against a municipal corporation, and as against express charter and statutory provisions such as are applicable in this case, designed to prevent the making of improvident or improper contracts, and we think, only when the circumstances are such as to make the application of the doctrine necessary to prevent manifest injustice. [Bragg City Special Road District v. Johnson, 20 S. W. (2d) l. c. 26.] The circumstances in this case do not require the application of the doctrine of estoppel, and it is our conclusion that the judgment must be affirmed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.