Joseph **KENNEDY**, et al.,
**Plaintiffs–Appellants,**

v.

**CITY OF ST. LOUIS, et al.,**
**Defendants–Respondents.**

No. 53486.

Missouri Court of Appeals,
Eastern District,
Division Five.

April 19, 1988.

Robert D. Arb, Valley Park, for plaintiffs-appellants.

Charles W. Kunderer, Edward James Hanlon, James J. Wilson, Julian Bush, Government Counsel, St. Louis, for defendants-respondents.

SIMEONE, Senior Judge.

I.

This is an appeal by four ophthalmologists, Drs. Wagih A. Satar, Malaz Safi, Nisaruddin Kahn and Shamlal Tekwani, from a judgment entered by the Circuit Court of the City of St. Louis on June 3, 1987 denying their claims for breach of contract of their positions as "physicians-in-training" or "residents" at former City Hospital No. 1 (Max C. Starkloff Memorial Hospital).[1]

The key issue in this proceeding is whether the appellants, four physicians,

1. The City contends that the judgment is not final and appealable. This action began by the filing of a petition in five counts by Dr. Joseph Kennedy, and Drs. Satar, Safi, Kahn and Tekwani under Rule 52.05. Subsequently individual amended petitions were filed by the four appellants, but Dr. Kennedy did not continue to prosecute his claim. At the opening of the evidentiary hearing, the court denied defendants' motion to dismiss Dr. Kennedy's claim, but granted a severance pursuant to Rule 52.05(b).

The judgment denying the appellants' claim is appealable. These permissively joined claims under Rule 52.05(a) are not "dependent" upon the outcome or final disposition of Dr. Kennedy's claim and therefore the judgment on the appellants' claim is a final and appealable one within the meaning of Rule 81.06, the Rule in effect at the time of the judgment. See *Speck v. Union Elec. Co.,* 731 S.W.2d 16, 21, fn. 3, (Mo. banc 1987); *Luecke v. Mo. Dept. of Conservation,* 674 S.W.2d 691, 692 (Mo.App.1984); *Willman v. Walker,* 734 S.W.2d 283, 285 (Mo.App. 1987); *Bi–State Development Agency v. Guyton,* 744 S.W.2d 332 (1988). *Crenshaw v. Great Central Insurance Co.,* 527 S.W.2d 1, 3 (Mo.App. 1975)—although arising out of the same transactions or occurrences, the Rule "speaks to a situation where the several claims" are "dependent upon each other." *Crenshaw, supra,* 527 S.W.2d at 3. *Cf.,* Rule 74.01 effective January 1, 1988.

who, having been offered positions as physicians-in-training (residencies) and who were assured by City officials that if their work was satisfactory they would advance and complete the program, and who were a special class of civil service employees in the classified civil service, have a constitutionally protected property interest to continued employment so that they are entitled to damages against the City, when the City closed the medical program due to budgetary restrictions, financial exigency and other reasons. We hold that these "limited" or "special temporary" public civil service employees do not have such a constitutionally protected property interest in their employment and thus affirm the judgment of the trial court.

## II.

The facts in this case consist of testimony, records and numerous exhibits. The essential facts for the resolution of this proceeding are the following. Drs. Satar, Kahn, Safi and Tekwani are physicians whose origins are other than the United States. Dr. Satar is an Egyptian, having attended medical school in Cairo. Dr. Kahn is from India, a United States citizen, and received his medical degree in India. He served a "surgical residency" in Cleveland, Ohio. Dr. Safi is from Syria, a graduate of Damascus University, and served his residency in Cleveland. Dr. Tekwani is a native of Pakistan; he attended medical school there and emigrated to St. Louis. Each of them, after reviewing a "green book" published by the American Medical Association which listed residency programs applied for a residency in the St. Louis City Hospitals. They were interviewed by the then Director of the Residency Program, Dr. Phillip Venable, and offered a position as "physician in training" in ophthalmology Unit I of the City Hospital. There were two units. Dr. Venable directed and supervised Unit I and Dr. Gerald Fivian supervised Unit II. When initially interviewed, Dr. Venable told the doctors that "it was a four-year program." They were told "we had a four-year program starting out with PG [Post-graduate] I, II, III, and IV, which was authorized by

the American Board of Ophthalmology." They were also told that "if their performance level was satisfactory that they would be appointed to a new year and the next level in the ophthalmology program." Each of the appellants accepted the position. Each of the physicians incurred moving expenses, discontinued their search for a residency at other hospitals and incurred other detriments. Dr. Satar began his residency in 1980; Drs. Safi and Kahn in 1981; and Dr. Tekwani in 1982. Each physician signed a document entitled "contract" for each year of service. These contract forms had been used for some thirty years. The contract recited that the physician had been "appointed" to the position of "resident physician" at a certain PG level, that it was for one year beginning July 1, of the particular year, and that "under the authority of the Ordinance of the City of St. Louis," the physician "accepted" the appointment and would receive a definite remuneration biweekly. The "contract" was signed by Dr. Ralph Kinsella, Chief of Staff, St. Louis City Hospital, and each of the ophthalmologists—appellants. In the early part of each year, Dr. Kinsella would forward to each appellant a "housestaff contract" requesting the appellants to sign and return to his office. The "contracts" were signed and returned, and a subsequent letter from Dr. Kinsella acknowledging receipt was sent to each of the physicians. Since the inception of their appointments, each of the physicians performed satisfactorily, advanced to the next level, received increases, and each year signed and accepted their "contract."

In February, 1983, each of the appellants were again forwarded a "contract" for the year 1983–1984. Each signed it and returned it to Dr. Kinsella. The personnel records of the Department of Personnel—the report of appointment—reflected that the physicians were appointed to a "limited term" for each year of their appointment. The records were signed by Ms. Alvaria Jaquess, Personnel Manager. She signed as the "appointing authority." The contracts were "approved" by Thomas Sehr, the Director of Health and Hospitals.

None of the contracts was signed by the comptroller of the City.

In June, 1983, each physician received a letter from Mr. Sehr, the Director of Health and Hospitals "that the 1983–1984 budget of the Division of Health and Hospitals" did not provide for the "continuation of the Unit I Ophthalmology Housestaff after June 30, 1983." The letter pointed out that this action was part of the severe reductions in the City Health and Hospital budget and indicated that the Department would "make every effort to provide you training opportunity for the year July 1, 1983 through June 30, 1984, within the resources available in our budget." At the evidentiary hearing, Mr. Sehr testified that when "we were constructing the budget" for the fiscal year starting May 1, 1983, "we were faced with a number of facts that had to be dealt with." The decision to "eliminate unit one was reached on a number of bases": (1) the "primary factor" was that the American Board of Ophthalmology "discredited" [2] the service, although "that decision was in the appeal process"; (2) the "second factor" was that the chief of Unit I, Dr. Phillip Venable "had either announced that he was retiring or had reached the City's mandatory retirement age ..."; [3] (3) the severe reductions in the budget; [4] and (4) there was an "accurate perception" that "we had an excessive number of physicians employed at the hospital."

As a result of the termination of the Unit I program, the personnel records of each of the physicians showed that as of June 30, 1983 they were at the "end of [their] contract[s] effective 6–30–83." This personnel record was again signed by Alvaria Jaquess. In August, 1983, each physician was notified that they had been removed from the payroll with the notation, "End of Temp. Apt."

Despite the ending of their contracts, each of the appellants continued in the ophthalmology Unit I program without pay serving the hospital until they each completed their residency. Dr. Satar completed his residency June 30, 1984; Drs. Safi and Kahn completed their residencies in June, 1985 and Dr. Tekwani's last year of residency was waived because of the closing of the hospital. But after June 30, 1983, they were not retained on the payroll, although other physicians in Unit II, some with less seniority, were given pay raises and retained. Each appellant did, however, "moonlight," or worked in other hospitals including the emergency room while they finished their residencies, and each earned compensation.

The ophthalmologists timely appealed their removal from the payroll to the Civil Service Commission, but on January 12, 1984 the Commission informed their attorney that the

> Civil Service Rules provide that only employees who have attained permanent civil service status may appeal actions to the Commission. The records of the Department of Personnel indicate that your clients were employed by the City of St. Louis on a limited term basis.

Their appeal was therefore denied. Thomas Sehr testified that the appellants were classified in the civil service as "physicians in training."

The Charter of the City of St. Louis contains provisions pertinent to this proceeding. Art. XVIII of the Charter establishes the Civil Service. The tenure of civil service employment under the Charter may be "indefinite," "definite" or "temporary appointments." Temporary appointments are "for not to exceed sixty days in any case." The Rules of the Civil Service Commission are identical to the Charter as to temporary appointments, but provide that

---

**2.** Dr. Phillip Venable indicated that the Unit was on "probation" rather than "discredited." A distinction rests between the two.

**3.** Dr. Venable did not in fact retire until June, 1985 when the hospital closed.

**4.** Answers to interrogatories by the City indicate that Mr. Sehr, in his presentation of the budget, stated that the budget "called for the elimination of Unit I of the Ophthalomologist Service." This statement was made to the Board of Estimate and Apportionment on May 18, 1983.

limited appointments are not to exceed six months. Rule VII, sections 5, 6.

Section 9 of Art. XXV of the City Charter provides that:

> All contracts relating to city affairs shall be in writing, signed and executed in the name of the city. In cases not otherwise provided by law or ordinance, they shall be made by the comptroller, and in no case by the board of aldermen or any committee thereof. Contracts not made by the comptroller shall be countersigned by him, and all contracts shall be filed and registered by number, date and contents with the register.

The Department of Personnel Administrative Regulation No. 607 relating to "Layoff Policies and Procedures," introduced at the evidentiary hearing provides that layoffs for employees serving in a "limited-term appointment" shall be in inverse order of employment. After the termination of the Unit I ophthalmology program, physicians in the Unit II program were advanced and received increases in salary.

Ordinance No. 58678, approved November 4, 1982 was introduced in evidence. That ordinance, in Section 2(1), recognizes the position of "postgraduate medical and dental training programs" for a "physician-in-training."

In its findings of fact, the trial court found that Thomas Sehr was the Director of Health and Hospitals, was the "Appointing Authority of, and had administrative control over, the Division of Health and Hospitals," but that John Noble, the hospital commissioner, had, among his other powers, the authority to hire physicians-in-training.

At the evidentiary hearing, a portion of the deposition of the comptroller was read. He was questioned as to his duties in terms "of any employment of City employees—and the issuance of payrolls." He answered that insofar as the payroll is concerned "we collect all the payrolls from all the City departments, and our payroll department verifies that by figures, sends it to the computer and the computer prints out the checks." Once the payroll clerk "signs off" as the "person being employed," the comptroller has nothing to do with further verification.

In November, 1986, each of the plaintiffs filed a separate amended petition seeking damages. These petitions were in five counts: (1) "Breach of Contract—Equitable Estoppel"; (2) "National Origin Discrimination under 42 USC 1983"; (3) "Violation of Due Process"; (4) Declaratory Judgment; and (5) "Quantum Meruit." Each plaintiff prayed for damages for the years they served as residents under the "contracts" and sought back pay and damages.

The City's answer asserted as an affirmative defense that section "432.070, R.S. Mo., 1978" and "Article XV [sic—XXV]" mandate that all contracts of the City must be in writing and signed by the Comptroller. The answer also (1) denied that the appellants had a "liberty or property" interest in their employments; (2) asserted as an affirmative defense that the appellants were "classified employees" of the City and as such failed to exhaust their administrative remedies; and alleged that (3) quantum meruit does not lie against the City; (4) all counts fail to state a claim upon which relief can be granted; and (5) the "closure of City Hospital No. 1" moots the petitions.

On the first day of the evidentiary hearing, the defendants filed a motion in limine requesting the court to exclude the "purported contracts" on the ground that they were not enforceable because the Board of Aldermen had not specifically authorized a contract with the plaintiffs as required by § 432.070, R.S.Mo. The court, believing it was bound by *Shadowood Dev. Co. v. City of Lake St. Louis,* 668 S.W.2d 647 (Mo. App.1984) sustained the motion in limine. Also at the commencement of the hearing, the City moved "for a judgment" on Counts I (breach of contract—equitable estoppel), IV (declaratory judgment) and V (quantum meruit). *Donovan v. Kansas City,* 352 Mo. 430, 175 S.W.2d 874 (banc 1943). The court granted the "motion for judgment" with respect to Counts I, IV and V. The cause then proceeded on Counts II (discrimination) and III (due process).

Various witnesses testified as to the above facts and many exhibits were introduced and discussed.

Each of the appellants testified that they accepted the position of "physician-in-training," that once the position was offered, they incurred expenses and did not seek other residencies, and that they could not seek another residency because it is necessary to apply long in advance. They each testified that they suffered loss of income and mental anguish. Dr. Kahn stated he had to "borrow" $30,000 at 21% interest. They each understood that they would be permitted to complete the four-year residency program as long as their work was satisfactory.

After hearing the evidence, the trial court dismissed Count II "for failure of evidence," and took Count III (due process) under submission. Trial memoranda were filed. The plaintiffs' memorandum concluded:

A review of the foregoing establishes that plaintiffs were employees who held positions in the classified service and who held indefinite tenure of employment or, at a minimum, tenure during the time frame [4 years] of the residency program, and that they could only have been 'layed-off' [sic] in 'inverse order of employment.'

The City's response contended that the plaintiffs' "terminations" were due to a budgetary lay-off, and was not "a termination for legal cause, for which a pre- or post-termination hearing is required."

On June 3, 1987, the trial court made findings of fact and conclusions of law. The court found *inter alia* that:

(1) plaintiffs were notified in June, 1983 that the 1983–1984 budget did not provide for the continuation of the Unit I program;

(2) a decision was made regarding accreditation by the American Board of Ophthalmology Residence Review Committee that required the program to terminate in 1984.

(3) because of the budget constraints and the accreditation problem, the physicians in Unit I were 'laid off,' and;

In its conclusions of law, the trial court held:

(1) The plaintiffs were not 'regular permanent employees' and as such were not entitled to appeal to the Commission.

(2) A non-permanent employee is entitled to a hearing only if he has a 'property right' in continued employment. These plaintiffs, 'although under the Civil Service ordinance, were a special class of temporary employees who were not entitled to a hearing before the Civil Service Commission even if they were dismissed without cause. At best, plaintiffs have shown a unilateral expectation of continued employment. That is not enough.'

(3) Although Count III alleges that the defendants failed to follow layoff procedures, and acted 'arbitrarily and discriminately,' appropriate layoff units may be designated under the rule.

The Court also concluded that the "accreditation problems" and the imminent retirement of the "nationally-renowned supervisor of the Unit, Dr. Venable, made the elimination of Unit I a reasonable decision. Plaintiffs have failed to show otherwise."

### III.

On appeal, appellants make four points. They contend that the trial court erred (1) in granting the motion in limine and excluding the "contract" documents relating to the employment of the appellants; (2) in granting the respondents' "oral motion for summary judgment" [sic] on Count I (contract—equitable estoppel) and Count IV (declaratory judgment) for the reason that the plaintiffs' offer of proof established "exceptional circumstances" sufficient to equitably estop the City from denying the validity of the employment contracts; (3) in denying appellants' procedural due process of a pretermination or post-termination hearing because appellants have a "protected property interest" in continued public employment arising out of the City's representations, course of conduct, express contract and the City's charter, ordinances and civil service rules; and (4) by finding in the

findings of fact that (a) the Unit I Program was required to terminate in 1984, (b) the physicians were laid off because of budgetary constraints and an accreditation problem, and (c) Dr. Venable was resigning for the reason that these findings were not supported by substantial evidence and are against the weight of the evidence.

As to the first point, appellants argue that the contracts were not required to be made or signed by the comptroller, pursuant to § 432.070, R.S.Mo. or that the City is equitably estopped from denying the contracts because of "exceptional circumstances." [5] They urge this court to hold, as a matter of law, that exceptional circumstances exist which necessitate the application of equitable estoppel and to grant them damages, including damages for back pay, emotional distress, and attorneys' fees.

### IV.

■ As to appellants' first point that the court erred in sustaining the respondents' motion in limine to exclude the purported "contracts" between the plaintiff and the City there is no error.

Section 432.070, R.S.Mo. and a long line of judicial authorities forbid local governments from making any contract "unless the same shall be within the scope of its powers or be expressly authorized by law." Such contracts "shall be in writing" and "shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

Article XXV, § 9 of the City charter requires all contracts relating to City affairs shall be made by the comptroller in cases not otherwise provided by law or ordinance.

As early as *West Virginia Coal Co. v. City of St. Louis*, 324 Mo. 968, 25 S.W.2d 466 (1930) where the plaintiff sought to recover damages for breach of contract for

the purchase of coal screenings, and the contract was not signed or countersigned by the comptroller, it has been held that a party could not recover. The court relied upon the statute and charter and noted that the law is applicable to the City of St. Louis. See also *Donovan v. Kansas City, supra,* 175 S.W.2d at 879—City not liable for foods furnished hospitals and penal institutions where no written certification by Director of Finance,—estoppel not applicable. The statutory provisions are intended for the protection of the City. *City of Weston v. Bank of Greene County,* 192 S.W. 126, 128 (Mo.App.1917); cases collected in notes following § 432.070.

The procedure by the trial court in sustaining the motion in limine followed the procedure in *Shadowood, supra,* and *State ex rel. Hwy. Com'n. v. City of Sullivan,* 520 S.W.2d 186 (Mo.App.1975).

Appellants do not address the issue of the validity of the contracts because they were not properly executed or countersigned by the comptroller. They rely principally upon the doctrine of equitable estoppel to urge that the City should honor the "contracts" until appellants' residencies were completed.

While the doctrine of "equitable estoppel" ordinarily is not applicable against governmental entities, courts may apply the doctrine in "exceptional cases" where required by "right and justice." *Murrell v. Wolff, supra,* 408 S.W.2d at 851.

■ In a long line of cases under Missouri law, the doctrine has been applied to municipalities, as well as to private persons. *State v. Missouri Utilities Co.,* 339 Mo. 385, 96 S.W.2d 607, 615–616 (1936),[6] 28 Am.Jur.2d, *Estoppel and Waiver,* § 128; *annot.,* 1 A.L.R.2d 338, 357, § 8 (1948). But where statutory and charter provisions relating to municipal contracts are not com-

---

**5.** Appellants rely upon *Murrell v. Wolff,* 408 S.W.2d 842, 857 (Mo.1966); *Han. & St. Jo. R.R. Co. v. Marion Co.,* 36 Mo. 295 (1865); *City of Mountain View v. Farmers' Telephone Exch.,* 294 Mo. 623, 243 S.W. 153 (1922); *Schueler v. City of Kirkwood,* 194 Mo.App. 575, 177 S.W. 760 (1915); *City of St. Joseph v. St. Joseph Terminal R. Co.,* 268 Mo. 47, 186 S.W. 1080 (banc 1916);

*State v. Missouri Utilities Co.,* 331 Mo. 337, 53 S.W.2d 394 (banc 1932); and *Rottjakob v. Leachman,* 521 S.W.2d 397 (Mo. banc 1975).

**6.** See *Missouri Utilities,* supra, 96 S.W.2d at 614–617 for an excellent analysis of the history and elements of the doctrine.

plied with, the doctrine is not applicable and the municipality is not estopped. See discussion in *West Virginia Coal Co. v. City of St. Louis, supra,* 25 S.W.2d at 471. The statutory and charter requirements with respect to contracts are mandatory, and not merely directory. *Donovan v. Kansas City, supra,* 175 S.W.2d at 881–82. See also *Layne v. City of Windsor,* 442 S.W.2d 497, 500 (Mo.1969); *Mullins v. Kansas City,* 268 Mo. 444, 188 S.W. 193, 196 (Mo.1916); *Eureka Fire Hose Mfg. Co. v. City of Portageville,* 106 S.W.2d 513, 516 (Mo.App.1937); *Fulton v. City of Lockwood,* 269 S.W.2d 1, 7 (Mo.1954); cases collected in n. 16, § 432.070 V.A.M.S.

None of the authorities relied upon by the appellants stand for the proposition that estoppel may be asserted so as to hold the municipality responsible on the basis of contract in violation of § 432.070 and the charter.

*Han. & St. Jo. R.R. Co. v. Marion Co., supra,* not only did not concern a contract, but was decided nine years before the statute, now codified as § 432.070, was enacted. *City of Mountain View v. Farmers' Telephone Exch. Co., supra; City of St. Joseph v. St. Joseph Terminal R. Co., supra* ; and *State v. Missouri Utilities Co., supra,* all involved franchises to use the public streets; *Murrell v. Wolff, supra,* 408 S.W.2d 842, involved a construction permit; and *Rottjakob v. Leachman, supra,* 521 S.W.2d 397, involved the collection of back taxes. None of these cases involved a purported contract or § 432.070. Only *Schueler v. City of Kirkwood, supra,* involved a contract and even there § 432.070 was not mentioned in the court's opinion. Subsequently, *Schueler* was limited by *Donovan.* See *Donovan v. Kansas City, supra,* 175 S.W.2d at 880.

### V.

In their second point appellants contend that the court erred in denying their procedural due process claim for the reason that they claim they had a constitutionally protected "property interest" in continued public employment based upon the City's representations, course of conduct, assurances, the Civil Service rules and City Charter. They claim that if given a hearing they may have been able to persuade the proper authorities not to terminate Unit I or to adopt other alternatives which would have allowed them continued employment.

In support of this point they rely principally upon the trilogy of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). They argue that the appellants were "employees who held positions in the classified service and who held indefinite tenure of employment, or at a minimum, tenure during the time frame of the residency program," and that a legitimate claim of entitlement to a property interest in continued employment may be established on the basis of rules or understandings in light of past policies and practices.

The Fifth and Fourteenth Amendments to the United States Constitution prohibit governmental actions which deprive any person of "life," "liberty" or "property" without due process. But the government need not give someone a procedure to determine the fairness of how it has treated that individual unless its actions fall within distinct rulings as to the meaning of "life," "liberty" and "property." J. Nowak, R. Rotunda, J. Young, *Constitutional Law,* 528 (1983). In order to have a property interest in a benefit or public employment, a person must have more than an abstract need or desire for it. He must, instead, have legitimate claim of entitlement to it. *Williams v. Board of Ed. Cass R–VIII School Dist.,* 573 S.W.2d 81 (Mo.App.1978).

In *Roth, supra,* an assistant professor who had no tenure rights was not deprived of any liberty or property rights when he was not rehired for a subsequent year. The court recognized that

The requirements of procedural due process apply only to the deprivation of interests protected by the Fourteenth Amendment's protection of liberty and

property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite.[7]

\* \* \* \* \* \*

To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more that a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth, supra,* 92 S.Ct. at 2705, 2709; *Marciano v. Civil Service Commission of the City of St. Louis,* 747 S.W.2d 758 (1988).

In *Perry v. Sindermann, supra,* it was held that, although the public employee's interest in continued employment was not secured by a contractual tenure provision, he was entitled to the protection of procedural due process since the institution had a *de facto* tenure program and the employee had tenure under that program. The court recognized that the property interest may not hinge on only an express written contract but may be based upon "implied" agreements and the words and conduct of the promisor in the light of the surrounding circumstances.

In *Loudermill,* it was held that a permanent "classified civil servant" was entitled to a pretermination and post-termination opportunity to respond to a charge of dishonesty or challenge his dismissal. *Loudermill,* unlike the present case, primarily dealt with what process is due when a protected property interest exists.

Under these decisions procedural due process claims are evaluated under a two-step approach: (1) to merit the protection of due process, the employee must possess a protected "property" or "liberty" interest that has been threatened by government action, and (2) then the employee is entitled to a pretermination or post-termination hearing. *Loudermill* deals with the second step. See *Developments in The Law, Public Employment,* 97 Harv.L.Rev. 1611, 1781 (1984).

█ The determination of whether a property interest exists is determined by state law or rules. *Roth, supra,* 92 S.Ct. at 2709; *Loudermill, supra,* 105 S.Ct. at 1491; *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Here, the trial court found that appellants' status was for a "limited term" of one year,[8] (according to the personnel records) and that appellants were a "special class of temporary employees." Appellants were not found to be indefinite employees, nor were they. We believe that appellants were civil service employees but they did not fit into one of the neat categories of civil service employees as established by the Charter or Rules. They were unique; they were not permanent or indefinite employees, they were employees for a definite time. They were, as the trial court held, in a "special class."

█ Under these circumstances, where appellants were employed year-to-year until their residencies were completed or until circumstances changed, and the Ophthalmology Unit was terminated, they had no constitutionally protected property interest or a claim of entitlement to continued employment until they completed their residencies. Appellants point to no statute, rule, policy or agreement that secures a property interest in continued employment after the unit was terminated. Under these circumstances, the physicians were of a "special class of temporary employees," and do not, we believe, have a constitutionally protected property interest in continued public employment when a unit is

---

7. See annot., *Due Process—Hearing—Public Employees,* 48 L.Ed.2d 996 (1977) and Supp.

8. A "limited term" civil service employee is, however, one employed not to exceed six months. Civil Service Commission Rule, Rule 7, § 5. Such misdesignation by the trial court, however, is not fatal.

closed due to budgetary exigencies and other legitimate reasons. *Board of Regents, supra,* n. 16, (year-to-year employment); *Loudermill, supra,* (termination for cause); *Bishop v. Wood, supra,* 96 S.Ct. at 2074; *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d (1974); *reh. den.,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148; J. Nowak, *Constitutional Law, supra,* at 551.

The decisions requiring procedural due process deal with dismissals or non-retention due to the conduct of the employee, and with termination for cause, and not with reemployment due to budgetary restrictions. Those decisions which deal with the denial of continued employment due to financial exigencies recognize that procedural due process is not required. We recognized in *Walker v. Personnel Advisory Bd. of State,* 670 S.W.2d 1 (Mo.App.1984) that indefinite term public employees are not entitled to termination hearings when public employees are laid off due to reductions in available funds. In *Praprotnik v. City of St. Louis,* 798 F.2d 1168 (8th Cir. 1986), *rev'd on other grounds, City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), it was recognized that in the ordinary budgetary lay-off situation, individual procedural due process hearings are not necessary, given the impracticality of imposing such a requirement. See *Riggs v. Commonwealth of Kentucky,* 734 F.2d 262, 264 (6th Cir. 1984), *cert. den.,* 469 U.S. 857, 105 S.Ct. 184, 83 L.Ed.2d 118 and *Smith v. Sorensen,* 748 F.2d 427, 435 (8th Cir.1984); 63A Am.Jur.2d, *Public Offices and Employees,* § 292 at 877–878 (1984).[9]

■ Given all these principles, we hold that the appellants, as a special class of limited civil service employees do not have a constitutionally protected property interest in continued public employment when Unit I was discontinued by the proper authorities because of (1) budgetary and financial restrictions; (2) the "problem" with the "disaccreditation" or "probation" of the Unit; and (3) the forthcoming retirement of the Director of the program. Although we recognize that a protected property interest may arise under conduct and circumstances which give rise to an implied contract, *Perry v. Sindermann, supra,* 92 S.Ct. at 2700, the course of conduct and representations of City officials, and the method of appointments and the Charter and Civil Service Rules, did not establish a constitutionally protected property interest, such as to require pretermination or post-termination hearings. Unit I was closed for reasons other than those which may be described as arbitrary, capricious or discriminatory.[10] Neither the conduct, course of conduct, representations nor assurances given by City officials nor the Civil Service Rules or Charter insured that the appellants would continue in their employment if and when financial exigency or other circumstances required terminating Unit I.

## VI.

■ In appellants' third point, they contend that the trial court erred in making certain findings of fact and in concluding that Dr. Venable was retiring, when in fact he did not retire until later—all of which were not supported by substantial evidence or were against the weight of the evidence.

The findings were supported by substantial evidence and were not against the weight of the evidence. Although Finding No. 6 may be somewhat ambiguous, it did not materially affect the ultimate conclusions reached by the trial court.

**9.** Lay-off decisions are analogous to decisions terminating public employees because of financial exigency. Dismissals based on financial exigency are impersonal and unrelated to a source over which the employee has not much control.

Numerous cases deal with the closing of a program or department in colleges and universities. See *e.g., Sacchini v. Dickinson State College,* 338 N.W.2d 81, (N.D.1983); *Krotkoff v. Goucher College,* 585 F.2d 675 (4th Cir.1978); *Graney v. Board of Regents of University,* 92 Wis.2d 745, 286 N.W.2d 138 (1979)—collecting decisions; *Bellak v. Franconian College,* 118 N.H. 313, 386 A.2d 1266 (1978); *Rose v. Elmhurst College,* 62 Ill.App.3d 824, 19 Ill.Dec. 919, 379 N.E.2d 791 (1978). Discharges or lay-offs for reasons of financial exigency are wholly distinct from discharges for cause.

**10.** Oral assurances of continued employment are insufficient to support a claim of entitlement to continued employment. *Stow v. Cochran,* 819 F.2d 864, 868 (8th Cir.1987); *Smith v. Sorensen, supra,* 748 F.2d at 432.

## VII.

In sum, we conclude that (1) the appellants were a special class of civil service employees within the civil service of the City; (2) although appellants were such employees with the right of continued employment for so long as their work was satisfactory and fiscal priorities permitted, they were non-permanent physicians-in-training positions authorized by Ordinance 58678, and as such had no constitutionally protected property interest in their continued employment; at best, appellants have shown only a unilateral expectation of continued employment; (3) Ophthalmology Unit I was terminated because of financial exigencies, "accreditation" or "probation" problems, and the impending resignation or retirement of the Director of the program, and its closing was not arbitrary, capricious or discriminatory; and (4) the appellants, having no property interest in their continued employment, were not entitled to a pretermination or post-termination hearing.

The judgment of the trial court is affirmed.

CARL R. GAERTNER, P.J., and GRIMM, J., concur.